# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

**17-296 consolidated with 17-297, 17-298, 17-299, 17-300, 17-301, 17-302, 17-303, 17-304, 17-305, 17-306, 17-307, 17-308, 17-309, 17-310, 17-311, 17-312, 17-313, 17-314, 17-315, 17-316, 17-317, 17-318, 17-319, 17-320, and 17-321**


**EMMA BRADFORD, ET AL.**

**VERSUS**

**CITGO PETROLEUM CORPORATION, ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NOS. 2007-2492, 2007-2498, 2007-2519, 2007-2911, 2007-3324, 2007-2921, 2007-3482, 2007-3394, 2007-2919, 2007-2610, 2007-2521, 2007-2625, 2007-2515, 2007-2507, 2007-2915, 2007-2598, 2007-2511, 2007-3332, 2007-2929, 2007-2603, 2010-922, 2007-2932, 2007-2497, 2007-3337, 2007-2516, and 2007-2502
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Mat Marion Gray, III
Ashley E. Bane
Fowler Rodriguez
400 Poydras Street - 30th Floor
New Orleans, LA 70130
Telephone: (504) 523-2600
COUNSEL FOR:
        Other - Louisiana Surplus Lines Association**

**Robert E. Landry**
**Kevin Paul Fontenot**
**Scofield, Gerard, Pohorelsky, Gallaugher & Landry**
**901 Lakeshore Drive – Suite 900**
**Lake Charles, LA 70601**
**Telephone: (337) 433-9436**
**COUNSEL FOR:**
    **Defendant/Appellant - CITGO Petroleum Corporation**

**Kirk Albert Patrick, III**
**Donahue, Patrick & Scott**
**450 Laurel Street - Suite 1600**
**Baton Rouge, LA 70801**
**Telephone: (225) 214-1908**
**COUNSEL FOR:**
    **Defendant/Appellee - R & R Construction, Inc.**

**Wells T. Watson**
**Jake Buford**
**Baggett, McCall , Burgess, Watson & Gaughan**
**3006 Country Club Road**
**Lake Charles, LA 70605**
**Telephone: (337) 478-8888**
**COUNSEL FOR:**
    **Plaintiff/Appellee - Emma Bradford**

**Marshall Joseph Simien, Jr.**
**Simien Law Firm**
**2129 Fitzenreiter Road**
**Lake Charles, LA 70601**
**Telephone: (337) 497-0022**
**COUNSEL FOR:**
    **Defendant/Appellant - CITGO Petroleum Corporation**

**Matthew David Monson**
**The Monson Law Firm, LLC**
**900 West Causeway Approach – Suite A**
**Mandeville, LA 70471**
**Telephone: (985) 778-0678**
**COUNSEL FOR:**
    **Other - Louisiana Surplus Lines Association**

**Richard E. Wilson**
**Somer G. Brown**
**Cox, Cox, Filo, Camel & Wilson, LLC**
**723 Broad Street**
**Lake Charles, LA 70601**
**Telephone: (337) 436-6611**
**COUNSEL FOR:**
  **Plaintiff/Appellee - Emma Bradford**

**Craig Isenberg**
**Joshua O. Cox**
**Barrasso Usdin Kupperman**
**Freeman & Sarver, L.L.C.**
**909 Poydras Street – 24th Floor**
**New Orleans, LA 70112**
**Telephone: (504) 589-9700**
**COUNSEL FOR:**
  **Defendant/Appellant - CITGO Petroleum Corporation**

**R. Heath Savant**
**Donohue Patrick, PLLC**
**450 Laurel Street - Suite 1600**
**Baton Rouge, LA 70801**
**Telephone: (225) 214-1908**
**COUNSEL FOR:**
  **Defendant/Appellee - R & R Construction, Inc.**

**THIBODEAUX, Chief Judge.**

CITGO Petroleum Corporation (CITGO) appeals the trial court's judgment in favor of twenty plaintiffs on the issue of causation. It also appeals the trial court's judgment in favor of thirteen plaintiffs on the issue of symptom duration following exposure to CITGO's chemical spill and release. Finding no error or manifest error in the trial court's judgment, we affirm.

I.

**ISSUES**

We must decide:

(1)　whether the trial court manifestly erred in finding that the twenty plaintiffs at issue established causation between their injuries and CITGO's slop oil spill and air release on June 19, 2006; and

(2)　whether the trial court manifestly erred in awarding damages for symptoms of thirteen plaintiffs beyond the duration of that suggested by the medical testimony.

II.

**FACTS AND PROCEDURAL HISTORY**

The facts of the spill and air release are well-documented, as several cases have come before this appellate court and the Louisiana Supreme Court. *See, e.g., Arabie v. CITGO Petroleum Corp.*, 10-244 (La.App. 3 Cir. 10/27/10), 49 So.3d 529, *aff'd on liability and causation, rev'd on punitive damage issue*, 10-2605 (La. 3/13/12), 89 So.3d 307 (referred to as *Arabie I*); *Arabie v. CITGO Petroleum Corp.*, 15-324 (La.App. 3 Cir. 10/7/15), 175 So.3d 1180, *writ denied*, 15-2040 (La. 1/8/16), 184 So.3d 694 (referred to as *Arabie II*); and *Cormier v.*

*CITGO Petroleum Corp.*, 17-104 (La.App. 3 Cir. 10/4/17), __So.3d __, 2017 WL 4401592.

On June 19, 2006, following a local flash flood, CITGO's Calcasieu Parish Refinery released four million gallons of slop oil and seventeen million gallons of wastewater into the Calcasieu River, contaminating over 100 miles of coastline with toxic liquids and mousse-like substances that emitted toxic fumes in addition to being toxic upon contact. The spill was the result of the failure and overflow of CITGO's closed-system, waste-water treatment unit. The overflow was described as a catastrophic event and an environmental disaster by CITGO's own representatives. The clean-up of the spill lasted for approximately six months, from June to December, 2006.

CITGO's Material Safety Data Sheet (MSDS) on slop oil from March 2006 ranks it as a chronic health and fire hazard. The MSDS states that the oil is extremely flammable and poisonous, and it contains Hydrogen Sulfide ($H_2S$) gas which may be fatal if inhaled. It can enter the lungs and cause damage. It is harmful or fatal if swallowed. Slop oil contains above di minimus levels of benzene, a known cancer hazard which can cause leukemia and other blood disorders, $H_2S$, xylene, toluene, n-hexane, and ethylbenzene. Benzene, toluene, and xylene are volatile organic compounds (VOCs). VOCs are chemicals that evaporate from a solid or liquid form at room temperature; long-term exposure can cause damage to the liver, kidneys, and central nervous system; short-term exposure can cause eye and respiratory tract irritation, headaches, dizziness, visual disorders, fatigue, loss of coordination, allergic skin reactions, nausea, and memory

impairment.[1]  Pursuant to CITGO's MSDS, slop oil also contains hexane, heptane, octanes, nonane, and trimethylbenzenes.  Slop oil and/or its components are listed on the Toxic Substances Control Act (TSCA) inventory.

Also on June 19, 2006, CITGO's steam lines became submerged and the facility released $H_2S$ and sulfur dioxide (S02) from sixty stacks in illegal concentrations for a full day, approximately twelve hours.  The wind was blowing from the southeast toward the north and northwest, then calming for parts of the day, allowing the toxic emissions to release into the surrounding community.

The plaintiffs in these consolidated cases live, work, and socialize in the areas around the CITGO facility.  They asserted various injuries as a result of their exposure to the toxic chemicals in the slop oil and wastewater spills and in the air emissions emanating from the CITGO facility on June 19, 2006.  The trial court found in favor of thirty-four of the thirty-six plaintiffs, and made awards in accordance with the court's assessment of the evidence.  CITGO appeals the parts of the judgment awarding damages to twenty-two of those plaintiffs.[2]  CITGO has

---

[1]United States National Library of Medicine.

[2]Twenty-six consolidated suits were appealed by CITGO.  Seven of those suits, whose numbers were included in the heading of CITGO's cover page, were not discussed at all inside CITGO's appellate brief.  Under Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4), we "may consider as abandoned any assignment of error or issue for review which has not been briefed."  Accordingly, the trial court's judgment in the following seven appeals, as shown included in the twenty-five companion opinions attached to this opinion, are also affirmed.

- 17-297 *Randy Thomas, Individually v. CITGO Petroleum Corporation, et al.* (trial docket 2007-2498).
- 17-300 *Richard Wayne Granger, et al. v. CITGO Petroleum CITGO Petroleum Corporation, et al.* (trial docket 2007-3324).
- 17-302 *William Breaux, Jr. v. CITGO Petroleum Corporation, et al.* (trial docket 2007-3482).
- 17-303 *Albert Andrepont, Individually v. CITGO Petroleum Corporation, et al.* (trial docket 2007-3394).
- 17-305 *Edward Wannage, Individually v. CITGO Petroleum Corporation, et al.* (trial docket 2007-2610).
- 17-314 *Daniel Welch, et al. v. CITGO Petroleum Corporation, et al.* (trial docket 2007-2929).

stipulated to liability, and its appeal is based upon causation and duration of damages only.

## III.

## <u>STANDARD OF REVIEW</u>

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two-tiered test must be applied in order to reverse the findings of the trial court: (a) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and (b) the appellate court must further determine that the record establishes that the finding of the trial court is clearly wrong (manifestly erroneous). *Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finders, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also

- 17-316 *Michael Lee v. CITGO Petroleum Corporation, et al*. (trial docket 2010-922).

4

upon the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

## IV.

## <u>LAW AND DISCUSSION</u>

CITGO first contends that the trial court manifestly erred in awarding damages to twenty plaintiffs "without expert testimony establishing that they actually had been exposed to harmful chemicals released by CITGO."

### <u>*Causation*</u>

In any personal injury suit, the plaintiff bears the burden of proving causation by a preponderance of the evidence. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603 (La. 2/20/95), 650 So.2d 757. A cause is a legal cause in fact if it has a proximate relation to the harm which occurs. *Butler v. Baber,* 529 So.2d 374 (La.1988). "A proximate cause is generally defined as any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred." *Sutton v. Duplessis*, 584 So.2d 362, 365 (La.App. 4 Cir.1991). The test for determining the causal relationship between an accident and injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. *Maranto*, 650 So.2d 757. If there is more than one cause of injury, "a defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm." *Rando v. Anco Insulations, Inc.*, 08-1163, p. 31 (La. 5/22/09), 16 So.3d 1065, 1088. Causation is an issue of fact subject to the manifest error standard of review. *Id.*

Proof of causation in toxic tort cases has two components, general and specific. *Pick v. American Medical Systems, Inc.*, 958 F.Supp. 1151, 1164 (E.D. La.1997). "General causation" refers to whether a substance is capable of causing a particular injury or condition in the general population, while "specific causation" refers to whether a substance caused a particular individual's injury. *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). A plaintiff cannot sustain his or her burden of proof with general causation proof alone; the plaintiff must also establish specific causation. *See Berzas v. Oxy USA, Inc.*, 29,835 (La.App. 2 Cir. 9/24/97), 699 So.2d 1149.

Citing various federal cases, CITGO asserts that expert testimony is required to prove both general and specific causation in toxic tort cases. But the cited cases only establish that expert testimony on causation is required. *See Atkins v. Ferro Corp.*, 03-945 (M.D. La. 2/11/08), 534 F.Supp.2d 662 (the expertise of plaintiff's only expert was in weather and climate); *Seaman v. Seacor Marine L.L.C.*, 08-30911 (5th Cir. 4/30/09), 326 Fed.Appx. 721 (plaintiff's medical causation expert was disqualified); *Allen v. Pennsylvania. Eng. Corp.*, 96-30209 (5th Cir. 12/31/96), 102 F.3d 194 (plaintiff's experts failed the *Daubert* analysis).

In *Bell v. Foster Wheeler Energy Corp.*, 15-6394 (E.D. La. 3/6/17), 2017 WL 889083, *2-3 (footnote omitted), Louisiana's middle district federal court stated as follows:

> Several of the defendants argue that William Bell does not offer sufficient specifics or detail in his deposition testimony to conclude that he was exposed to asbestos in or on the defendant's products. But the Fifth Circuit "has inferred proximity to products from purely circumstantial evidence similar to the evidence in this case." *See Slaughter v. S. Talc Co.*, 949 F.2d 167, 172

(5th Cir. 1991). "In *Whatley v. Armstrong World Industries*, 861 F.2d 837 (5th Cir. 1988), for instance, [the Fifth Circuit] upheld a jury's allocation of fault for plaintiff's asbestos-related injury, even though there was no direct evidence that the plaintiff had worked with the defendants' products." *Id.* Except with respect to York International Corporation and Foster Wheeler Energy Corporation, there is sufficient evidence in the record to create a genuine material fact dispute as to the extent of William Bell's exposure to each defendant's products. The causation issue is best left for trial, where the jury can decide for itself the extent of William Bell's exposure and the jury can benefit from detailed expert testimony from both sides regarding the nature of asbestos exposure.

There is one additional causation issue worth addressing with respect to expert testimony. IMO Industries, Inc. argues that a plaintiff cannot meet his burden of proof on causation in a toxic tort case without expert testimony as to specific causation. . . . But the cases cited by IMO Industries . . . only establish that expert testimony on causation is required—not that an expert opinion as to specific causation is required. *See, e.g.*, *Seaman v. Seacor Marine L.L.C.*, 326 Fed.Appx. 721, 729 (5th Cir. 2009) ("And, without admissible expert evidence in this toxic-tort case, Seaman cannot prove causation.").

IMO Industries essentially alleges that if an expert cannot render a reliable opinion as to specific causation, then a jury cannot find that the plaintiff proved specific causation as a matter of law. But that is incorrect. The standard for offering an opinion as an expert is wholly distinct from the standard by which a jury must judge the plaintiff's case. Expert testimony regarding general causation combined with specific evidence regarding the nature of the decedent's exposure may be sufficient to permit the jury to conclude that a particular defendant's product was a substantial factor in causing William Bell's mesothelioma.

Here, contrary to CITGO's assertions, the plaintiffs in this case provided expert testimony establishing general causation and provided medical testimony establishing specific causation.

7

Dr. Barry Levy, an occupational and environmental health physician and epidemiologist with thirty-five years of experience, established general causation in this case via his prior depositions and trial testimony[3] submitted into evidence at the trial of these consolidated cases. Dr. Levy received a Bachelor of Science degree summa cum laude from Tufts College, a Master of Public Health degree from the Harvard School of Public Health, and a Doctor of Medicine degree from Cornell University Medical College. He has worked as a Medical Epidemiologist for the Centers for Disease Control, for which he received the U. S. Public Health Service Commendation Medal. He founded and directed the Occupational Health Program at the University of Massachusetts Medical School. Dr. Levy has written more than 150 journal articles and book chapters and edited thirteen books, including five editions of the textbook now entitled "Occupational and Environmental Health: Recognizing and Preventing Disease and Injury" and two editions of the book "Preventing Occupational Disease and Injury." Dr. Levy has clinically evaluated thousands of individuals who had developed, or were at risk of developing, a wide range of adverse health effects as a result of environmental and/or occupational exposure to chemical substances.

Frank M. Parker III, a Certified Industrial Hygienist, also established general causation. Mr. Parker has a Bachelor of Science in Civil Engineering from Virginia Military Institute (VMI) and a Masters in Aerospace Operations Management from the University of Southern California. He was Chief, Military Public Health, Occupational Medicine Services Section, and Chief, Bio-

---

[3]Dr. Levy's expert testimony on slop oil was accepted by the courts in *Arabie I*, *Arabie II*, and *Cormier*; and his expert testimony on H2S and S02 was accepted in the trial of *Michael Alvarado, et al v. CITGO*, 2007-2924. Dr. Levy also gave specific causation testimony on Michael Lee in this group of cases, but Mr. Lee is not one of the twenty-two plaintiffs whose awards are being appealed herein.

environmental Section, while in the Air Force, and has been Manager, Industrial Hygiene for Shell and Tenneco. Mr. Parker was also Adjunct Assistant Professor of Industrial Hygiene, Environmental Sciences, School of Public Health, University of Texas, Houston. He is a retired Colonel in the U.S. Air Force Reserve. Since 2004, he has been the Partner and Chief Executive Officer of Caliche, Ltd., a consulting firm. He has published numerous articles throughout his career on industrial hygiene, toxic exposure, health and safety.

Mr. Parker opined on the failure of CITGO to warn the community and the likelihood of the plaintiffs' exposure to both volatile and non-volatile chemicals contained in the slop oil and in the air release. In reaching his opinion, Mr. Parker considered the depositions of the plaintiffs, numerous CITGO documents, correspondence with the Louisiana Department of Environmental Quality (LDEQ), regulations of the Occupational Safety and Health Administration (OSHA) on Hazardous Waste Operations and Emergency Response, and Standard Operating Safety Guides by the Environmental Protection Agency (EPA) for Hazardous Waste. He also explained OSHA regulations regarding respiratory protection, numerous depositions of CITGO employees and fact witnesses, photographs, maps, CITGO's internal call logs and monitoring practices, and CITGO's MSDS documents on slop oil and S02. Based on these documents, a review of scientific literature, and his vast experience as an Industrial Hygienist, Mr. Parker opined that CITGO's and LDEQ's air monitoring data were inconsistent with first hand observations obtained from fact witnesses as well as documents provided by CITGO. He testified to the unsafe concentrations of toxic chemicals spilled and released on June 19, 2006, and to the symptoms and health effects that occur in people who are exposed to these chemicals.

Dr. Robert Looney, a physician with more than fifty years of experience, established specific causation for a number of the plaintiffs. He practices general medicine and occupational and environmental medicine at Health Associates of Lake Charles and is the Chairman of the Occupational Medicine Department. Dr. Looney holds professional memberships in the American College of Occupational and Environmental Medicine, the Southeastern Occupational and Environmental Medicine and the American Board of Medical Review Officers. His experience diagnosing patients and providing treatment for their symptoms and illnesses associated with the petro-chemical industry is extensive. Dr. Looney is and has been the Medical Examiner for Dyn-McDermott Strategic Oil Storage since 2004. In the past, he has been Medical Director for P.P.G. Industries, Hercules, Inc., Boeing Aircraft, and Amoco Oil. Dr. Looney also examined and treated approximately 300 ethylene dichloride exposure patients in Lake Charles.

Dr. Steve Springer, a board certified physician in Family Practice, also established specific causation for the plaintiffs who he examined or ran tests on. He is the sole proprietor of Springer Family Medical Clinic. Dr. Springer has seen hundreds of chemical exposure patients. Dr. Springer was the Family Medicine Chief at Christus St. Patrick Hospital from 2006 to 2008 and is presently the Medical Director of Christus St. Patrick Hospital Diabetes Education Center.

## *Exposure to Slop oil*

*MSDS on Symptoms of Exposure*

The MSDS states that breathing the gas or vapor from slop oil may cause severe nose, throat, respiratory tract, and lung irritation, respiratory paralysis, and death; symptoms include coughing, choking, or shortness of breath.

Additionally, inhalation may cause central nervous system depression with symptoms including nausea, headache, dizziness, fatigue, drowsiness or unconsciousness. It can cause eye irritation with tearing, redness, stinging or burning and can cause swelling of the eyes with blurred vision. Skin contact can cause skin irritation with redness, itching, burning or swelling of the skin and may cause harmful effects in other parts of the body. Ingesting slop oil can cause stomach or intestinal upset with pain, nausea and/or diarrhea. If the material gets into the lungs during swallowing or vomiting, it can cause lung damage, possibly leading to chronic lung dysfunction or death.

The MSDS states that exposure to slop oil may cause damage to the blood, kidneys, lungs, liver, mucous membranes, heart, lymphatic system, peripheral nervous system, upper respiratory tract, immune system, skin, auditory system, bone marrow, central nervous system eye, lens or cornea, and testes.

*Epidemiology Studies*

Dr. Barry Levy testified regarding numerous epidemiology studies involving people who worked around oil spills, people who lived in the vicinity of oil spills, and people who participated in the clean-up of oil spills. Residents of Karachi, Pakistan were the subject of a study on health effects of exposure to the crude oil spill from the Tasman Spirit. Dr. Levy explained the association between the residents' exposure and their symptoms of skin irritation, nausea, headaches, dizziness, irritability, weakness of arms and legs, fever, loss of appetite, fatigue, eye, and respiratory symptoms. Studies also showed related exacerbation of asthma, vertigo, headache, back and leg pains, and psychological ailments.

Prolonged respiratory problems of one or two years showed up in the study of the Prestige oil spill, and a follow-up to the study showed five years of symptoms. Dr. Levy explained that for various reasons, including but not limited to genetics and underlying diseases, people react differently to chemical exposure. Thus, an important factor regarding duration of symptoms is individual susceptibility. The conclusion was that even short periods of exposure to oil sediments could have detrimental health effects. Other studies addressed psychological injuries such as depression and anxiety.

*Parameters of the CITGO Spill*

CITGO's Significant Events Report indicates that closures of the Ship Channel increased northward and southward each day after the spills on June 19 and June 20. The report log for 7:35 p.m. on June 23 states that the Captain of the Port increased the safety zone at 4:00 p.m. to what appears to be the final, official, northern and southern parameters of the spill zone for prohibiting marine traffic. The northern parameter was Channel Light 116 just south of Coon Island, which is north of the I-210 Bridge; and the southern parameter was Channel Light 52 south of Calcasieu Lake, also known as Big Lake. The Intracoastal Canal was closed from Calcasieu Lock to mile marker 242. The report states that this was necessary because heavy currents from recent rains sped the oil into both lakes and because the concentration of fumes from oil could cause nausea, headaches, dizziness, and could make travel hazardous. Finally, at 7:39 p.m. on June 23, CITGO made what appears to be its first public announcement, stating that the spill may irritate upper airways and cause mild nausea in "sensitive individuals," but with no long term effects. It warned the public to stay away from the oil spill.

*Permissible Exposure Levels*

Slop oil is an amber to dark amber liquid which has an odor of rotten eggs if $H_2S$ is present. Industrial Hygienist Frank Parker characterized the slop oil as the refinery's "garbage dump." He testified that it probably contains hundreds of chemicals. CITGO's toxicologist, Mr. Washburn, stated that slop oil also contains Polycyclic Aromatic Hydrocarbons (PAHs). Mr. Parker testified that because slop oil is a mixture of chemicals, there are no published exposure limits. However, the components have published limits. The primary release hazards in slop oil include benzene, and the acid gas, hydrogen sulfide/$H_2S$.

Benzene is a carcinogenic that causes blood abnormalities and central nervous system depression. CITGO's MSDS indicates that up to ten percent of slop oil is benzene. CITGO argued that the benzene had evaporated within the first twenty-four hours of the spill. Mr. Parker testified that this is not correct. He testified that benzene does not attach to water molecules or become absorbed in water. It remains benzene and combines with wind and water to form mousse-like clumps which sit partially on top and partially submerged in the water. When it is disturbed, for example by boats or vacuum trucks or other clean-up activities, droplets of mist containing all of the chemicals are released anew. Thus, he testified that CITGO's position that the hazardous materials were liberated or evaporated early in the spill is incorrect. Mr. Parker explained that this is borne out in the data and documentation showing high peak days later on. On June 22, 2006, a ship called the Sea Bolt Trader recorded a benzene level of nine parts per million (9ppm). One of CITGO's toxicologists found a benzene reading of 11ppm. Mr. Parker testified that the Permissible Exposure Level (PEL) for benzene is 1ppm. Dr. Levy testified that the American Petroleum Institute issued a document

in 1948 that said *no* exposure to benzene is safe. Mr. Parker confirmed that if one smells benzene, you are already unquestionably overexposed.

CITGO's 1997 MSDS indicates that up to five percent of slop oil is Polynuclear Aromatic Hydrocarbons (also PAHs) which cause photosensitivity and eye irritation; if inhaled, it can cause irritation with cough and bronchitis. Xylene also irritates eyes, skin, and mucous membranes. CITGO's 1997 MSDS and its March 2006 MSDS state that up to three percent of slop oil is hydrogen sulfide/ $H_2S$. It can irritate the eyes at 4ppm. Olfactory fatigue occurs rapidly at 50ppm; thus odor is not a reliable warning property. It can irritate the respiratory tract with possible pulmonary edema at levels above 50ppm. The 1997 MSDS states that $H_2S$ is severely toxic at 200ppm and can cause bronchitis at 250ppm, but the March 2006 MSDS states that the National Institute of Occupational Safety and Health (NIOSH) has determined that levels above 100ppm are immediately dangerous to life and health (IDLH). Exposure to $H_2S$ can cause loss of consciousness, depressed respiration, and death at 500ppm.

The March 2006 MSDS states that even sub-acute exposure to low levels of $H_2S$ can produce eye irritation, watering, light sensitivity and corneal opacity, bronchitis, pulmonary edema, nausea, abdominal cramps, diarrhea, lung cavity formation and chronic lung dysfunction. The organs or organ systems that may be aggravated by significant exposure to this material or its components include skin, respiratory system, peripheral nervous system, central nervous system, blood-forming system, and auditory system.

Maps show that on July 3, 2006, two weeks after the spill, heavy oil was still around Calcasieu Refinery. Documents prepared by one of CITGO's industrial hygienists, Mr. Melancon, shows peak levels of $H_2S$ around July 4, 2006.

A July 12, 2006 damage assessment report by Lisa DiPinto, Ph.D. states that airboat surveys identified shorelines and marshes with "extensively oiled sediments" which she characterized as having "PAH odor, sheen when probed, surface and/or buried oil layer in trenches." Michael Lee is one of the plaintiffs in this case whose awards are not being appealed, but it is noteworthy that Dr. Levy related his symptoms to slop oil exposure at Calcasieu Refinery beginning on July17, 2006.

In addition to previously discussed occurrences, CITGO's Significant Events Report contained numerous comments and complaints, some of which are summarized below:

*June 21, 2006*
- Oil on property of homeowner on Port Street near Moss Lake.
- CII Carbons sent folks home sick from potential exposure.
- One admitted to Lake Charles Memorial with chest pains.

*June 22, 2006*
- Oil on property at Port Road address in Sulphur.

*June 23, 2006*
- Odor and Oil on Property Road address in Carlyss; reported to 911; Local Fire Department responded and registered high benzene levels.
- Prien, Moss, and Calcasieu Lakes all closed to traffic.
- Heart patient sick for two days.
- Two Hydrochem employees taken for evaluation and urinary phenol testing.
- First public service announcement: smell may irritate upper airway and cause mild nausea in sensitive individuals; no long term effects; stay away from oil spill.

*June 24, 2006*
- Oil in Lagoon and dead turtle at Keel Road, north end of Moss Lake.
- Claim by homeowner on Edgewater.
- Complaint of smell by another homeowner on Edgewater.
- Six-inch-deep film across property line of homeowner on Fernwood.
- Oil on property on Dogwood.
- Oil on another property on Dogwood; sees boom but still flowing.

*June 25, 2006*
- Complainant from Hackberry Seafood upset and filing claim.

*June 27, 2006*
- Area monitor going off at end of Indian Marais. Safety zone stretches from Light 116 north of I-210 bridge to Light 56.

*June 28, 2006*
- Miller Environmental employee at Clifton Ridge feeling lightheaded.
- Ambulance to Food Tent at CITGO Park; personal illness.
- Calcasieu Lake opened at southern border of safety zone; Prien Lake and Moss Lakes still closed.

*June 29, 2006*
- Press Release: Avoid entering areas where oil can be seen or smelled; do not fish in areas with visible oil sheens or slicks; avoid skin contact with oil, oil-contaminated water and sediments.

*June 30, 2006*
- Coast Guard enforcing safety zone from Channel Light 116 in north to Channel Light 92 in south. Boaters "may encounter stray sheen or light concentrations of oil outside the safety zone and if so they are advised to avoid these areas."

*July 1, 2006*
- Coast Guard safety zone still at Channel Light 116 in north and Light 92 in south to protect boaters from clean-up operations.

*July 2, 2006*
- Coast Guard reduces safety zone slightly to Light 115.
- Small areas of heavy oil still remain in/near Indian Marais, in Moss Lake, Clifton Ridge, and north of Venco; Moss Lake still closed.
- One dead dolphin and two others in distress near Intracoastal.

*July 3, 2006*
- Light rainfall forces clean-up crews out of water due to safety concerns; rain is flushing oil from hard to reach shoreline areas back into water. This will help collection of oil in the long term.

*July 6, 2006*
- Boaters allowed to transit through safety zone, but no loitering, stopping, landing, swimming, fishing, or crabbing.
- Deployed Community Impact Assistance Team to Prien and Moss Lakes with community advisory regarding the above restrictions.

*July 7, 2006*
- Received approval for posting signs at Prien Lake, I-10, and Calcasieu Point boat launches regarding three access points for recreational

boats, the above community advisory restrictions, and compliance enforcement.

As indicated, the dangers of the oil spill did not evaporate within twenty-four hours of June 19, nor did they abate at any time during the period that the current plaintiffs assert exposure to the slop oil. While some of the plaintiffs could not recall the exact date of their exposures, the trial court was given significant circumstantial evidence that tied their exposures to the subject spills. The trial judge stated in her reasons for judgment that many of the plaintiffs were eggshell plaintiffs with pre-existing conditions that were exacerbated by their exposures. The plaintiffs' awards reflect such analysis. In reviewing the record of each plaintiff's claim of exposure to slop oil, we find no manifest error on the part of the trial court in finding that these plaintiffs established the causal link between their exposure to the slop oil and their symptoms.

*John Nash*

John Nash was fishing in the ship channel at daybreak on the morning of the spill, having launched the boat near the I-210 bridge. He remembered the date as June 19 because of the historical "Juneteenth."[4] Mr. Nash noticed an unusual smell which became stronger as he worked his way up the channel. He immediately began having headaches. After forty-five minutes, the smell became unbearable. Dr. Springer based his causation opinion on this patient history and on Mr. Nash's July 3 visit to his primary care physician, Dr. Percival Kane, which indicated that Mr. Nash had been "fishing around the CITGO spill" area when he began having headaches and dizziness. The trial court noted that when Mr. Nash

---

[4]"Juneteenth" is short for "June Nineteenth," an American holiday celebrating the June 19, 1865 enforcement of the Emancipation Proclamation in Galveston, Texas.

was questioned about the bad weather on the day of the spill, he replied that one of his favorite times to fish was in bad weather. The trial court found Mr. Nash to be "exceptionally credible and informative," and she believed that the exposure contributed to his diarrhea and aggravated pre-existing anxiety and psychiatric conditions.

*Hilda Johnson*

Hilda Johnson was an 81-year-old widow at the time of trial. At the time of her exposure, she was sitting on a bench outside of L'Auberge Casino waiting for her vehicle to be brought from valet parking when her eyes suddenly started to burn and water; her throat burned, and she could not stop coughing and choking. L'Auberge Casino is located north of the I-210 bridge and east of Coon Island. Ms. Johnson was there during the daytime and smelled what she described in her deposition as an odor of ammonia. The trial court felt that, due to her age and lack of sophistication, Ms. Johnson related it to an ammonia smell, but her symptoms were consistent with the MSDS symptoms for exposure to slop oil vapors. Ms. Johnson continued to have a cough and difficulty breathing. The trial court discussed Ms. Johnson's efforts to self-medicate with home breathing treatments to no avail.

Dr. Springer opined that Ms. Johnson had exposure-related aggravation of pre-existing respiratory problems, with eye irritation, wheezing and headaches. Ms. Johnson's other medical records indicate that she went to Moss Regional Hospital's emergency room on July 6, and the nurse recorded "2 weeks or more" of increased nebulizer use, breathing difficulty, headaches, and eye irritation. In reviewing an earlier record dated June 26, wherein Ms. Johnson had

18

gone to the same emergency room with complaints of hip and knee pain, with no notation of breathing problems, Dr. Springer explained that emergency rooms focus on the acute problem at the time. Ms. Johnson testified that she thought she had been in an accident. The second visit on July 6 documents increased respiratory problems and eye irritation for at least two weeks, which supports the causal link between those problems and Ms. Johnson's encounter with the slop oil vapors following the spill on June 19. While Ms. Johnson had suffered a heart attack and a stroke since her exposure, and her memory was incomplete in areas, she was emphatic in her testimony about how sick she was after the CITGO incident and the extra nebulizers and breathing treatments she was given.

*The Richard Family—Angelina, Bridgett, and Lawrence Richard, Darrell Partner, and Leola Tanner*

These plaintiffs participated in a family reunion at the I-210 beach on June 20, 2006. The date was established by a child's pediatric record dated June 21, and testimony of Angelina Richard that she had taken her son to the doctor the day after the reunion. The family saw the rainbows on the water, and Bridgett Richard had all the children get out of the water for fear of what might be in it. The trial court found the testimony very credible and reliable, except for that of Lawrence Richard, who had been a child at the time, and whom the court believed "was simply trying to please whomever asked him questions." Still, his symptoms at the time were consistent with the MSDS descriptions of symptoms following exposure to slop oil, as were the symptoms of the other family members. Dr. Springer related Lawrence Richard's symptoms of eye irritation, nausea, sinus issues, and vomiting to the slop oil exposure on June 20, 2006. The trial court commented that the family were unsuspecting people, indicating that this is the

"whole reason" that corporations should issue warnings, to protect the unsuspecting who just want to enjoy a day at the beach.

Angelina Richard described the smell at the beach as worse than usual, and she saw rainbows and oil on the water. Her eyes began to burn; her nose began to get runny; and her throat itched. She also had a second exposure while working for Labor Finders, where she served lunch to clean-up workers and passed out due to the chemicals. Dr. Springer based his causation opinion on the fact she and the family were at the beach on June 20, supported by a medical record dated June 21, and on their explanations of the smell, the sheen on the water, and their physical reactions and symptomologies.

Bridget Richard testified to noticing the smell at the beach and to seeing "little color rings" in the water caused by oil. She became nauseated; her eyes burned; and her throat became irritated. Based upon this history and Dr. Ayer's medical records, Dr. Springer related Ms. Richard's nausea, sinus issues, and headaches to exposure to slop oil on June 20, 2006.

Leola Tanner was Bridgett Richard's aunt, and she had passed away by the time of trial. In her deposition, Ms. Tanner had described the smell at the beach, the sight of oil on the water, and the nausea. She also testified to vomiting, diarrhea, headaches, and eye irritation. Based upon this history and Dr. Arimura's medical records from his treatment of Ms. Tanner, Dr. Springer related her symptoms of eye irritation, sinus and respiratory issues, gastrointestinal complaints, loss of appetite, and fatigue to the June 20 exposure.

Darrell Partner testified that after the exposure at the beach he had eye irritation, nausea, and a runny nose. The trial court found him a credible and matter-of-fact witness. Mr. Partner reported to Dr. Ayers that two months after the

exposure he had headaches, sore throat, nausea, vomiting, and diarrhea. Dr. Springer related all of these symptoms to Mr. Partner's exposure to slop oil on June 20, 2006.

*Emma Bradford*

Emma Bradford was seventy-six years old at the time of trial. She had been crabbing at the Ellender Bridge near Highway 27 with her sister approximately one week after the oil spill. They noticed a bad smell and saw a sheen or rainbow effect on the water. Their eyes were burning. The smell was so bad they had to leave after a couple of hours. They tried to cook the crabs but they smelled too bad to eat. Ms. Bradford suffered with nosebleeds, dizziness, eye irritation, headaches, and sleeping problems. Dr. Springer related her symptoms to slop oil exposure. While Ms. Bradford had had some of these symptoms prior to the exposure, Dr. Springer found that the exposure to the slop oil resulted in an acute exacerbation of those symptoms. The trial court found Ms. Bradford to be credible and found her nosebleeds, eye irritation, and headaches to be related to slop oil exposure.

*Rodney Guillory*

Rodney James Guillory Sr. recounted being exposed to the slop oil on three occasions pertinent to this litigation. He was driving via I-10 toward Sulphur to play church bingo and smelled the chemicals. A few days later, he noticed the distinctive smell at the Isle of Capri Casino. Subsequently, he and his wife met friends at a home near the water at Big Lake, and he smelled the chemicals again. Mr. Guillory testified that his longest-lasting symptoms were headaches and trouble sleeping. He also had eye irritation, coughing, burning eyes and throat,

21

runny eyes, trouble breathing, and sinus allergies. He saw Dr. Looney, who indicated that Mr. Guillory was a sick man and susceptible to symptoms without much exposure. He related his symptoms to his exposure to the mixture of chemicals that he encountered. Dr. Fayez Shamieh, a neurologist who saw Mr. Guillory for his headaches, also found that his symptoms were secondary to chemical exposure.

*Cheryl Wilmore*

Cheryl Wilmore was an employee of the Isle of Capri Casino. She described being on break while working the late shift, midnight to 6:00 a.m. She smelled the strong odor and saw dead fish in the water surrounding her work site. Ms. Wilmore was exposed to the smell again while waiting for the bus to go home. She reported to Dr. Looney in October 2006 that she had had headaches every day since that time. Dr. Looney opined that Ms. Wilmore's headaches, nausea, night sweats, and trouble sleeping were related to her exposure.

As discussed above, these plaintiffs provided expert testimony through Dr. Barry Levy and Industrial Hygienist Frank Parker relating their symptoms to the numerous toxic chemicals spilled in massive amounts into the waterways around which the plaintiffs worked and socialized. Additionally, the plaintiffs proved specific causation through medical evidence provided by Dr. Springer, Dr. Looney, and their other various physicians. Thus, they have satisfied the general and specific causation elements required to prove damages from toxic tort exposure. CITGO's argument that the specific level of exposure in each and every location at an exact time of day or night was not proved through expert testimony falls because such is not a requirement under the law. *See Bell v. Foster*

22

*Wheeler Energy Corp.*, 2017 WL 889083. Moreover, Frank Parker testified that CITGO's monitoring system was well below standard, at times disapproved of by its own industrial hygienists, and that CITGO curtailed its readings and stopped its investigation early on, placing it in the hands of its legal advisors. We find no manifest error in the trial court's finding on causation as to any of the plaintiffs exposed to the slop oil.

### *Exposure to Air Release of Hydrogen Sulfide & Sulphur Dioxide*

In addition to the $H_2S$ in the slop oil, impermissible levels of $H_2S$ were being emitted from sixty stacks at CITGO, from 7:00 a.m. to 8:00 p.m. on June 19, 2006, according to CITGO chemical engineer and investigator, Tim Bloomfield. His testimony indicated that no one knew how far the emissions were above legal limits because the monitors on the stacks were "pegged out" (past the level of detection). Mr. Bloomfield stated that plume miles can be used to calculate the levels, but his team did not do that. He further stated that if the concentration was above 10ppm, which is CITGO's established exposure limit, fresh air breathing protection is needed. Mr. Bloomfield told no one outside of the CITGO facility that impermissible levels of $H_2S$ were being released into the community for an entire day.

Dr. Levy testified in 2016 that both of these chemicals are irritants of the entire respiratory tract from the nose and sinuses all the way down to the terminal air sacs in the bottom of the lungs, and they are irritants of the eyes. He further stated that the throat irritation and cough associated with exposure to sulfur dioxide has to do with the fact that the chemical converts to sulfuric acid when it comes into contact with the mucous membranes that line the respiratory tract. The

23

symptoms of exposure include irritation of the eyes, nose, throat, rhinorrhea, meaning runny nose, choking cough, in some instances bronchoconstriction, or tightening of the airways, and increased pulmonary resistance, causing breathlessness or shortness of breath.

Mr. Parker testified that CITGO's personal monitors were set too high at 10ppm. He discussed the minimum risk level issued by the Agency for Toxic Substance Disease Registry (ATSDR) and stated that symptoms of $H_2S$ exposure can be seen at .07 and .02ppm. He stated that most people smell $H_2S$ at less than 1ppm. Mr. Parker further explained that the Acute Exposure Guidelines Level (AEGL) rating is for the general population whose members have sensitivities, not for healthy CITGO employees, but the CITGO personal monitors were still set pretty high. One agency used a minimum risk level of .01ppm. Mr. Parker stated that at a level one AEGL rating, people exposed to $H_2S$ start to get irritation problems if exposed to .75ppm for ten minutes and if exposed to only .33ppm for eight hours. CITGO documents reported an $H_2S$ reading of 6 on Highway 108, and one employee had a reading of 13ppm on his personal monitor. There were high reports as far as I-10. Mr. Parker stated that $H_2S$, identified by its rotten egg smell and referred to in training documents as sour gas, is heavier than air and accumulates in low-lying areas and confined spaces, especially with low wind conditions.

The June 19 air release also contained sulfur dioxide/S02. Mr. Parker testified that $H_2S$ and S02 are both acid gases; that S02 is twice as heavy as $H_2S$; and that S02 is worse for the body. He stated that S02 will produce sulfuric acid when it is exposed to watery mucous membranes, eyes, and lungs. It can cause severe irritation, and if the concentration is high enough, it can cause tissue

corrosion. He stated that the minimum safety requirement for both gases is eye protection.

CITGO's March 30, 2006 MSDS for sulfur dioxide/S02 states in the overview that the gas is clear and has a hydrogen sulfide odor; that it is harmful if inhaled; that it causes severe irritation to the lungs and respiratory tract; and that damage to the lungs may result from over-exposure. The major routes of entry are skin contact and inhalation. Skin contact can cause frostbite injury, skin burns, and permanent skin damage. Inhalation causes irritation of the throat and lungs with cough and difficulty breathing; and it can cause death depending on the level and duration of exposure. Contact with the eyes can cause tearing, redness, stinging, burning, swelling of the eyes with blurred vision, and damage to the lens or cornea. Respiratory system disorders can be aggravated by exposure to S02.

The MSDS further states that over-exposure to S02 can cause pulmonary edema, increased airway resistance, and in severe cases, erosion of tooth enamel and reduced sense of smell. In its Notes to Physician section, the MSDS states that development of pulmonary edema may be delayed for forty-eight to seventy-two hours. The minimum required personal protection equipment (PPE) for workers at the Lake Charles facility is neoprene-type gloves, chemical resistant clothing such as slicker suit and boots, and full-face supplied-air respirator or self-contained breathing apparatus. The work-place exposure limits established by the American Conference of Governmental Industrial Hygienist (ACGIH) are 2ppm for eight hours and 5ppm for fifteen minutes. The MSDS on S02 further states that its "[o]dor is NOT adequate to warn of hazardous conditions." In its Toxicity Data section, the MSDS states that acute upper respiratory system effects occur when exposed to 3ppm for one hour. This section

25

also states that S02 is a severe irritant to the eyes, skin, and upper respiratory tract, and that a concentration of 10ppm can cause eye, nose, and throat irritation, runny nose, choking, and cough.

Mr. Parker pointed out that the release of both S02 and $H_2S$ at the same time could effectively cut the exposure limit of each acid gas in half. He explained numerous exhibits of CITGO documents with worrisome reports of the release of 300ppm VOCs. These included CITGO's call logs of internal communications among its plant operators, supervisors, and engineers describing a dense blue haze of $H_2S$ and S02 crossing Highway 108 and intensifying as the morning progressed. Those logs detail frantic activity as CITGO called in its industrial hygienists and dispatched them to various areas to take readings while the operators tried to get the failing equipment under control. $H_2S$ personal monitors were going off and CITGO had to call a shelter in place alarm at its CITGO Lube and Wax (CLAW) facility across Highway 108 and had to evacuate other areas. Later in the morning, due to the thick haze and S02 danger, it had to call a second shelter in place at the CLAW facility. But calls were coming in from residents in the area as well, and they were unprotected and unaware of the specific harm in the smell and the haze enveloping them. Mr. Parker testified that the wind was out of the south and blowing north to northwest from CITGO's location on the south side of Highway 108. When the wind was calm, it allowed the fumes to settle on the community where the plaintiffs were located. A small sampling from CITGO's communications log is summarized below:

*June 19, 2006*
- 4:19 a.m.: Starting to have sulfur problems.
- 4:22 a.m.: Steam down to 192; one alarm called.
- 4:47 a.m.: Jones to Reed—Reformer Amine $H_2S$ has hit 300ppm.

26

- 4:48 a.m.: More rain is on the way and some units are flooded out.
- 4:49 a.m.: AI507 is 300ppm at maximum range of instrument. Can we raise the amine rates.
- 6:34 a.m.: Reynolds to Newman—numerous $H_2S$ meters going off at the contractors' compound.  Smell $H_2S$.
- 7:08 a.m.: JL at IMC; $H_2S$ leak at Acid; will not let him back here. Alarms going off for Acid Plant $S02$ emissions.
- 7:34 a.m.: CLAW shelter in place implemented.
- 8:15 a.m.: Woman outside refinery encountered cloud and odor while driving by Gate 64 on Highway 1133; had to cover her face with towel and alleges her small daughter was coughing up blood.
- 8:24 a.m.: Haze thickens; Perrodin at CLAW reports $H_2S$ level 13.
- 8:43 a.m.: Owen requesting reading from Griffin; after 108 go north on Beglis, then west on Patton; extremely high under the bridge.
- 8:52: May shut down ALCOH due to flaring of $H_2S$.
- 9:02 a.m.: [Haze] laying down heavy on Highway 108.
- 9:34 a.m.: Recon employee's mom left home off Beglis sick.
- 10:08 a.m.: Two Lube Lab employees treated for $H_2S$ exposure.
- 11:19 a.m.: Flaring appr. 6,500 pounds of $S02$ per hour from SWS.
- 11:21a.m.: Reed to Owen–blue cloud leaving facility crossing Highway 108; go check it out; video–blue haze fills entire view.
- 11:25 a.m.: Outside call–lady complaining of headaches and daughter throwing up blood.
- 11:41 a.m.: Reed to Talbot–recommend closing Highway 108.
- 11:50 a.m.: $H_2S$ reading of 6 on Highway 108.
- 12:18 p.m.: Henry to Reed–Blue cloud is $S02$; by the time it gets to Highway 108 it is on the ground.
- 12:58 p.m.: EPA Webster to Reed–receiving citizen complaints.
- 1:16 p.m.: Video–looking west, white out conditions west of CLAW.
- 1:19 p.m.: Video–looking north/northwest, haze increases again.
- 2:01 p.m.: Dense haze has worsened.
- 3:57 p.m.: Video–looking west and north, haze rolling in from south.
- 4:21 p.m.: Please call medical regarding fumes at Lube.
- 4:36 p.m.: Need to get out of Thermal Oxidizer, haze is causing people a lot of problems north of here.
- 4:53 p.m.: Charles Conner at Lube complains of throat and lungs burning; refuses RX; "Will take own meds at home!!"

The locations of the plaintiffs who claim exposure to the air release were all within a few miles of each other, and they were all on the dirty side of the release, north and northwest of CITGO and Highway 108.  In mapping the parameters of their claims, we note that Highway 108 has a vertical or north-south running leg, which runs straight down south from I-10 for approximately 2.4 miles,

27

then abruptly turns west on a perpendicular horizontal leg for approximately 3.2 miles, until it runs into Highway 27, which runs vertically back up to I-10. What we have just described is a rectangular box on a map in zip code 70665, created by I-10, the two perpendicular legs of Highway 108, and Highway 27. CITGO sits just south of the box and the horizontal leg of Highway 108, which separates CITGO from the community and residents to the north. The plaintiffs exposed to the air release of $H_2S$ and $S02$ were located inside, or along the legs of this small box.

*Mallory Charles*

At the time of the air release, Mallory Charles was a helper in the machine shop at Ohmstede, a company located south of I-10 on Swisco Road, which runs west from its intersection with the vertical leg of Highway 108, and which is northwest of the CITGO facility. Part of Mr. Charles's job was to clean the yard outside the shop, which he usually did on Monday mornings from 5 a.m. until noon, even if he had to wear a rain-suit. He noticed an odor but could not pinpoint it because there were daily odors in the area of the refineries. That afternoon, he suddenly had nausea, congestion, and flu-like symptoms, though he had felt fine when he came to work that morning. Mr. Charles testified that he self-medicated with Alka-Seltzer Cold Plus and went to bed. He missed a few days of work, got better, then missed a couple more days during the month and remembered seeing one of his physicians, who basically recommended cough syrup.

Dr. Springer opined that the location, date, time, and symptoms described by Mr. Charles were consistent with exposure to the chemicals released

28

by CITGO on June 19. The trial court found that Mr. Charles's symptoms lasted one month and awarded him a total of $15,000 for his medical expenses, general damages, loss of enjoyment of life, and fear of future disease.

*Charles Jones*

Mr. Jones worked for Howell Industries, located south of I-10 and north of CITGO in Sulphur. He arrived at work at 3:30 p.m. on June 19 and took a meal break at 7:00 p.m. He went outside. Mr. Jones recalled a raunchy odor after his break, causing him and his co-worker to joke about needing an $H_2S$ monitor. Then Mr. Jones got a very bad headache that would not go away. Based upon this history, the immediate onset of headache, persistent cough and bronchitis, for which he saw Dr. Hutchinson, Dr. Springer related Mr. Jones's symptoms to his exposure at his workplace northwest of CITGO in a building ventilated by industrial fans. The trial court commented that Mr. Jones said more than once that he had always been a very healthy person and that he had never smoked. The court also commented that he was diagnosed with bronchitis on June 30, 2006, and said that his problems were ongoing.

*Clara Espree*

On June 19, 2006, Ms. Espree was delivering mail for the Port of Lake Charles to the Bulk Terminal located across the river from the Port. She was stopped at the train tracks near Bayou D'Inde Road at Highway 108 for a lengthy period and could not move. A very foul smell came into her car through the air conditioning vents. It caused her eyes to burn and her throat to become irritated. Ms. Espree testified that she had to wash her face back at work and became nauseated and developed headaches, which she admitted to having prior to her

exposure. The trial court found that she had suffered an aggravation of these symptoms and also of nosebleeds found in her medical records. The trail court also found that Ms. Espree had some related sinus and gastrointestinal problems as well and found that her symptoms lasted for two months.

*Wanda LeBlanc and Sha'da LeBlanc*

Wanda and Sha'da LeBlanc are mother and daughter, respectively. Sha'da LeBlanc was nineteen years old at the time of the release. She was with her parents delivering shrimp to customers in the Sulphur area. They had driven up Highway 27 from Cameron and were out for five or six hours. She noticed a strong scent that was not normal, and she started to feel sick to her stomach and got a headache. She also had sinus problems. Sha'da admitted to having migraines in the past, but said this was different, a throbbing pain on the right side of her head. She self-medicated with Aleve and Pepto-Bismol. She testified that the symptoms that began on that day have continued off and on since then. Dr. Springer related her symptoms to the release based upon her location, her immediate sinus irritation and headaches.

Wanda LeBlanc testified that she was bringing shrimp orders into Sulphur through Hackberry with her husband and daughter when she noticed a foul "egg smell" that caused her nose to run, sinus irritation, and wheezing. Dr. Springer relied on the same history for Wanda LeBlanc because she and Sha'da were together on the day of their exposure. He noted that Wanda's reports of dizziness, headache, cough, and wheezing began at the time of release. Dr. Springer also found that her increasing and worsening headaches, causing her to schedule a neurological evaluation, were causally related to her exposure to the

CITGO air release. The trial court found that, while no doctor had ever related her kidney failure to the exposure, Wanda's fear associated with her exposure and future illness was real and true.

*The Love Family—Ellvin, Linda, and Darien Love*

Ellvin, his wife Linda, and his son Darien, were at Mr. Love's older son's house on Ravia Road for a family barbeque. Ravia Road is in the southern part of the box, north of and parallel to the horizontal leg of Highway 108. Mr. Love said they were outside and smelled a strong odor like rotten eggs, and "something was falling." They had to cover the meat and go inside. Mr. Love said his eyes started burning, and he had a runny nose.

In the next day or so, Mr. Love went to his job with BFI, and he went to CITGO to empty the dumpsters which contained oil pads from the clean-up operations. He got oil in his truck. When he got to the landfill he had to get in the back of the truck and physically throw the oil pads out of the hopper door. The vapors were so strong and burned his eyes such that he had to stop and get out of the back of the truck. He also had hoarseness this time and sought medical attention with Dr. Nabours in August and September of 2006. He also saw Dr. Springer who noted symptom onset within twenty-four hours of exposure and opined that Mr. Love's sore throat, runny eyes, and cough were the result of his exposures. Mr. Love said that he was still on eye medication at the time of trial.

Linda Love testified that she and her son went to the cook-out, and her husband joined them after work. She said the smell on Ravia Road was so bad she had to get the children inside. Once inside, they had to turn off the air conditioner because the smell was coming through the vents. She was coughing, had trouble

breathing, and her eyes were burning. Her son, Darien, who was around nine, was asthmatic. He started coughing and wheezing and was of great concern to her. She gave him hot coffee which usually settled him, but it did not ease the discomfort in his chest, which lasted into the evening. Eventually, she and Darien went to Memorial Hospital with these symptoms in July 2006. She was having headaches, nausea, fever, throat pain and cough.

The Loves were questioned extensively about other chemical releases in the area and other lawsuits they have participated in, but Ms. Love made it clear that after the event on Ravia Road, her son Darien had the worst attack she had seen, and she thought she was going to lose him. She testified that she did not have his nebulizer and albuterol with her, but once she got back home, she was able to treat him herself. That was the reason they put off going to the doctor at that time.

Dr. Springer testified that the history of the event on Ravia Road, the immediate onset of the chest tightness, headaches, and eye irritations, in addition to the subsequent medical records several weeks later were consistent with exposure to the subject chemical release. The trial court commented that Mr. Love had a faulty memory regarding the dates at issue, but found Ms. Love's memory better, and found their testimony credible.

*Adrian Watkins*

According to his deposition, Mr. Watkins had a good recollection of the date of his exposure because it was three days after his sister's birthday, which was June 16. He testified that he drove to Sulphur in the morning over the I-210 bridge to attend a class for work. His vehicle's windows were down, and he

32

noticed a bad smell.  Later the same day he had nausea, vomiting and diarrhea. The trial court found that Mr. Watkins's gastrointestinal symptoms lasted approximately three weeks and awarded him medical expenses plus $7,500 for pain and suffering and $2,500 for loss of enjoyment of life.

*Wanda Anderson*

Wanda Anderson was a postal employee who detailed cars on the side.  On the afternoon of her exposure, Ms. Anderson met clients at a restaurant near the intersection of Highway 108 and Highway 27 and followed them to a nearby residential location to wash and detail their cars.  She could not recall the date of her exposure.  Ms. Anderson noticed a smell but thought it was normal for the area.  The job took three to four hours, and she finished in the evening around 7:00-8:00 p.m.  Ms. Anderson reported burning, watery eyes, nausea, vomiting, and diarrhea.  She saw her primary care physician, Dr. Hutchinson, with similar complaints on June 22 and on July 12, 2006.  The trial judge found Ms. Anderson very credible and responded to CITGO's argument that the weather was rainy on the day of the air release.  The judge stated that she had lived in Louisiana all of her life and knew that one location can have a lot of rain while another will be merely overcast.  It is also pointed out by her counsel that the time of Ms. Anderson's exposure in the evening would have occurred after the rain had stopped.  Dr. Springer related her symptoms to the release based upon her location, CITGO's MSDS, and the multitude of people he saw with similar symptoms who were exposed to the same chemicals at the same time.

We find no manifest error in the trial court's finding that each of the above plaintiffs proved a causal link between their injuries and their exposure to $H_2S$ and S02 in the CITGO air release of June 19, 2006.

### *Pain and Suffering; Duration of Symptoms*

CITGO next asserts as error the trial court's award of damages to thirteen plaintiffs "for symptom durations exceeding the durations to which their own medical causation expert testified." CITGO does not appeal the amount of the general damage awards to any of these plaintiffs. It merely objects to the trial court's determination of the duration of their symptoms where Dr. Springer agreed to a lesser duration during his testimony. It should be noted at this juncture that Dr. Springer, often during cross-examination, limited his opinion on duration of symptoms to the date of the last medical record that was placed before him for review. Our review of the record indicates that the trial court listened carefully to the testimony of each plaintiff and considered the plaintiff's testimony as to how long he or she continued to have symptoms after the last medical visit, which we note to be realistic, as the last medical visit is not a magic bullet that suddenly remedies a plaintiff's symptoms and makes him whole again. It was in the trial court's discretion to consider each plaintiff's testimony in assessing pain and suffering, i.e., general, damages.

> General damages may be established in three ways: (i) the circumstances of the case, (ii) expert medical testimony, and (iii) the tort victim's testimony. Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 7.02[3] (2004 ed.). "General damages do not have a common denominator and are determined on a case by case basis." *Glasper v. Henry*, 589 So.2d 1173, 1180 (La.App. 4th Cir.1991) (citing *Bernard v. Royal Insurance Co.*, 586 So.2d 607 (La.App. 4th Cir.1991)). The jurisprudence holds that the duration of a plaintiff's symptoms and treatment are relevant factors that courts must consider in assessing general damages. See *Gillmer v. Parish Sterling Stuckey*, 09-0901 (La.App. 1 Cir. 12/23/09), 30 So.3d 782, 788; *Glasper*, supra (noting the factors to be considered in assessing quantum for pain and suffering are severity and duration).

*Jones v. Progressive Security Insurance Co.*, 16-463, p. 20 (La.App. 3 Cir. 12/29/16), 209 So.3d 912, 926 (quoting *Watson v. Hicks*, 15-56, pp. 29-30 (La.App 4 Cir. 5/27/15), 172 So.3d 655, 677-78).

Further, although a witness may be recognized by the trial court as an expert, the trier of fact remains free to accept or reject the expert's conclusions. La.Code Evid. art. 702. *State v. Smith*, 96-261 (La.App. 3 Cir. 12/30/96), 687 So.2d 529, *writ denied*, 97-314 (La. 6/30/97), 696 So.2d 1004. This is in keeping with the federal case of *Bell*, 2017 WL 889083, cited earlier in this opinion.

As to the thirteen plaintiffs whose general damage awards CITGO disputed, two of them were not included in the first assignment of error as having failed to prove causation, so they are not discussed above.

### *Exposure to Slop Oil*

*Carrie Tezeno*

One such plaintiff is Ms. Carrie Tezeno, a custodian working outside on the water at Lake Charles Country Club. She noticed the smell, saw the oil on the water, and described the clean-up efforts that she saw. Thus, her damages are from her exposure to the slop oil. Ms. Tezeno had a pulmonary function test at Dr. Springer's office and filled out a questionnaire indicating that she had had headaches, shortness of breath, dizziness, and sleep problems around the time of the spill. She testified that she did not remember the exact dates of her exposures, but they occurred over the days and weeks that she worked outside. She testified that she had been feeling bad but kept working because she did not get paid if she missed work. Dr. Springer testified to a causal relationship based upon Ms. Tezeno's work location, the time frame of her symptoms, and the fact that her

symptoms were "consistent with what some other people suffered from" in this litigation.

Ms. Tezeno had also gone to the emergency room at Memorial Hospital on August 6, 2006, with nausea, diahhrea, and weakness; she was diagnosed with acute gastritis. Dr. Springer testified that he did not put those symptoms on his questionnaire because he did not realize until later that these were also common symptoms of the subject chemical exposures. Therefore, he said, Ms. Tezeno could not check off the symptoms if they were not included on the questionnaire. Dr. Springer did relate her August visit to her exposures. Dr. Springer was questioned by CITGO regarding the fact that the August 6 medical report indicated only four days of nausea and diahhrea. Dr. Springer stated that if Ms. Tezeno related to the court that she was sick the whole time since her exposure, but let the symptoms build until she finally had to go to the doctor, that was "something for the court to decide." Dr. Springer repeatedly testified that he would relate all of Ms. Tezeno's symptoms to the spill for the six to eight week period following the June 19 spill. Sometimes he referred to it as the two month time frame. Ms. Tezeno testified that she missed three days of work after the emergency room visit on August 6, and Dr. Springer agreed that he would relate her symptoms to the spill until "shortly after the ER visit." The trial court awarded Ms. Tezeno pain and suffering damages for two months.

CITGO asserts that the trial court erred in awarding two months of damages when Dr. Springer only related 6.5 weeks of symptoms to the exposure. Two months is essentially 8.0 weeks; thus, CITGO is disputing a difference of only 1.5 weeks between the trial court's award and Dr. Springer's alleged estimate on duration. The record reveals that Dr. Springer said two months, or six to eight

36

weeks. It was not manifest error for the trial court to award two months, or eight weeks, of damages. This is particularly true where Ms. Tezeno worked sick and eventually had to call an ambulance and be transported to the emergency room on a stretcher, which speaks to the severity of Ms. Tezeno's symptoms as well.[5]

> The jury may adopt or reject conclusions of experts, according to its own best judgment, giving them weight as they see fit. *Arceneaux v. Koch*, 567 So.2d 786 (La.App. 3rd Cir.1990). A trier of fact may find adequate proof of a disability by way of testimony of subjective complaints of pain despite the lack of objective symptoms. *Gates v. Ashy Construction Co.*, 171 So.2d 742 (La.App. 3rd Cir.1965), *writ denied*, 173 So.2d 542 (La.1965). Factors to consider in assessing damages for pain and suffering include the severity and duration thereof. *Hopkins v. Travasos*, 569 So.2d 1056 (La.App. 3rd Cir.1990).

*Simar v. NOWCAM Services*, 617 So.2d 164, 169-70 (La.App. 3 Cir. 1993).

> It is well settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. *Iles v. Ogden*, 09-0820, p. 4 (La.App. 4 Cir. 2/26/10), 37 So.3d 427. La.C.C. art. 2324.1 provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Furthermore, the assessment of quantum, or the appropriate amount of damages, by the trial judge or jury is a determination of fact, one entitled to great deference on review. *Wainwright v. Fontenot*, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. The jury has the latitude to choose between witnesses, including expert witnesses, and to use such expert testimony together with its own common sense and experience to arrive at its conclusions of fact. La. C.E. art. 704; *Burns v. CLK Investments V, L.L.C.*, 10-0277, p. 10 (La.App. 4 Cir. 9/1/10), 45 So.3d 1152. A jury may choose the opinion of one expert, or even reject the opinion of the sole expert. *See Bachemin v. Anderson*, 97-2471, p. 4 (La.App. 4 Cir. 7/29/98), 717 So.2d 677, 680. The jury's acceptance of part or all of each expert's testimony is within its discretion in fact finding. *Joseph v. Archdiocese of New Orleans*, 10-0659, p. 3 (La.App. 4 Cir. 11/10/10), 52 So.3d 203.

---

[5]Ms. Tezeno's pain and suffering award was $10,000.

*McMaster v. Progressive Sec. Ins. Co.*, 14-155, p. 6 (La.App. 4 Cir. 10/29/14), 152 So.3d 979, 983, *writ denied*, 14-2641 (La. 3/6/15), 160 So.3d 1289.

Further, the fact finder is entitled to the aid of an expert in determining the existence or nonexistence of facts not in common knowledge, but an expert may not take the place of the fact finder as to ultimate determinations of fact. *See State v. Franklin*, 520 So.2d 1047 (La. App. 3 Cir.1987); *State v. Nelson*, 306 So.2d 745 (La.1975). Moreover, the factfinder may disregard expert testimony altogether. *Burns v. CLK Investments V, L.L.C.*, 10-277 (La.App. 4 Cir. 9/1/10), 45 So.3d 1152, *writ denied*, 10-2283 (La. 1/7/11), 52 So.3d 886.

*Hilda Johnson*

Of those more fully discussed in the causation section above, CITGO contends that Dr. Springer testified to a symptom duration of only 2.5 weeks for Ms. Hilda Johnson, but the trial court awarded damages for 1.5 to two months. The record reveals that Dr. Springer agreed that Ms. Johnson's reported symptoms were related to her exposure, "up to July 6th, for sure." July 6, 2006, was the date that Ms. Johnson went to Moss Regional's emergency room when her inhalers no longer worked. At that time she was put on breathing treatments. While CITGO seeks to cut off her symptoms as of the date of that July 6 visit, Ms. Johnson testified that it took her quite a while to see results from the new breathing treatments. She testified that it took her more than two weeks of the breathing treatments to get better. This places her almost at the six week mark, or. 1.5 months, granted by the trial court. We find no abuse of discretion in the award.[6]

---

[6]Ms. Johnson's pain and suffering award was $10,000.

*Angelina Richard*

CITGO contends that Dr. Springer testified to a symptom duration of only seven weeks for Angelina Richard while the trial court awarded her damages for four months. Ms. Richard was back in Lake Charles for this litigation after having served three years in Afghanistan. She was working at Baylor Hospital in Texas at the time of trial. Ms. Richard testified that she had continued to have symptoms for three or four months after her and her infant's exposure to the slop oil contaminated water at the I-210 beach. The trial court commented that she was impressed with Ms. Richard's testimony and found her very credible. We find no abuse of discretion in the trial court's award of four months for pain and suffering.[7]

*Darrell Partner*

CITGO contends that Dr. Springer testified to a symptom duration of only seven weeks for Mr. Partner, but the trial court awarded damages for three to six months. CITGO bases its argument on an August 9, 2006 visit to Dr. Ayers. However, Mr. Partner testified that prior to the family outing on the beach, he had never gotten sick, but following the exposure, he continued to have really bad allergies. The trial court did not award Mr. Partner damages through trial. We find no abuse of discretion in the trial court's having valued his damage at three to six months.[8]

---

[7]Ms. Richard's award for pain and suffering was $14,000.

[8]Mr. Partner's award for pain and suffering was $17,500.

*John Nash*

CITGO further contends that Dr. Springer testified to a symptom duration of only two weeks for Mr. John Nash, but the trial court awarded damages for seven months. Mr. Nash testified that headaches were unusual for him prior to the exposure, and that he had never experienced the type of symptoms before the exposure as he did afterward. He testified that his headaches lasted for six or seven months. The trial court's award does not constitute an abuse of discretion.[9]

*Emma Bradford*

CITGO contends that Dr. Springer testified to a symptom duration of only two to eight weeks for Ms. Bradford, but the trial court awarded damages for three to six months. Ms. Bradford testified that her sister who was with her crabbing at Ellender Bridge had breathing problems and died after the exposure. Ms. Bradford said that she had had a rash on her back in November of 2006. She had also had a kidney removed and had had cancer following her exposure. It appears that the trial court limited Ms. Bradford's award to three to six months because Ms. Bradford also had a claim for chemical exposure from the Georgia Gulf release in September 2017. We find no abuse of discretion here.[10]

*Kenneth Pappion*

Of the thirteen plaintiffs disputed by CITGO in this second assignment of error, Kenneth Pappion is the second person for whom causation was not challenged in CITGO's first assignment of error. CITGO contends that

_____

[9]Mr. Nash's award for pain and suffering was $21,000.

[10]Ms. Bradford's pain and suffering award was $15,000.

Dr. Springer testified to a symptom duration of only two months for Mr. Pappion, but the trial court awarded him pain and suffering damages through trial.

Kenneth Pappion worked for Southern Ionics on Bayou D'Inde Road about a half mile from the water and about a mile and a half southwest of CITGO. He had been there around twelve years and had never missed a day of work. He testified that he was working 7:00 a.m. to 7:00 p.m. and usually got there at 6:30 a.m. When he got to work on the morning of June 20, 2006, he noticed a horrible gas smell. As the day progressed, he became nauseous, lightheaded, and was going to the restroom with diahhrea. He also reports headaches and sinus problems. Mr. Pappion worked sick for the rest of the week and continued to self-treat with over the counter medication as the symptoms came and went after that. He saw Dr. Springer on August 16, 2006, and was tested for breathing abnormalities by his office seven months later. Dr. Springer related diahhrea and headaches to his exposure until August 16, limiting it to two months because Mr. Pappion did not return to him again with those complaints.

However, Mr. Pappion testified that he still had ongoing problems with diahhrea and nausea, and sudden feelings that he needed to throw up. He also had ongoing urinary and erectile dysfunction problems for which he was treated by Dr. Charles Humphries in February 2007, at the age of thirty-nine. The trial court found that Mr. Pappion's ongoing problems were related to his exposure in his work environment. Given Mr. Pappion's testimony, the MSDS and other testimony regarding the dangers of slop oil exposure, we cannot say that the trial court abused her discretion in awarding damages through trial.[11]

--------

[11]Mr. Pappion's pain and suffering award was $25,000.

## *Exposure to Air Release*

*Charles Jones*

Of those exposed to the air release, CITGO contends that Dr. Springer testified to a symptom duration of only sixteen to eighteen days for Mr. Jones, but the trial court awarded damages through trial. Dr. Springer only opined with regard to a June 30, 2006 visit to Mr. Jones's physician, Dr. Hutchinson, who diagnosed bronchitis and treated Mr. Jones with shots and antibiotics. However, Mr. Jones testified that the medicine did not work and he had to see Dr. Hutchinson again. Mr. Jones also testified that he had to go to the emergency room a few months before trial because he could not breathe. He apparently was choked up on the witness stand, and said that he had been in the military, was always healthy, had never smoked in his lifetime nor had problems before the exposure, but now he has serious upper respiratory problems twice a year. It was within the trial court's discretion to base her award of pain and suffering upon the MSDS and Mr. Jones's testimony regarding the intensity and duration of his upper respiratory symptoms.[12]

*Sha'da LeBlanc*

CITGO contends that Dr. Springer testified to a symptom duration of only five weeks for Sha'da LeBlanc, but the trial court awarded damages for two months. Ms. LeBlanc testified that the nausea and headaches have continued off and on since her exposure. The trial court limited the pain and suffering award to two months, which was in her discretion to do.[13]

---

[12]Mr. Jones's award for pain and suffering was $35,000.

[13]Sha'da LeBlanc's pain and suffering award was $10,000.

*Darien Love and Linda Love*

CITGO contends that Dr. Springer testified to a symptom duration of only five weeks for Darien Love and Linda Love, but the trial court awarded damages for three months. Dr. Springer's opinion was based upon visits to Memorial Hospital on July 27, 2006. However, Ms. Love testified that her son is still on long-term allergy medication, and that she is still on eye drops. The trial court apparently limited their durations to three months because they were also exposed to chemicals in the Georgia Gulf release in September of 2006, which was in the court's discretion to do.[14]

*Clara Espree*

CITGO contends that Dr. Springer testified to a symptom duration of only three weeks for Ms. Espree, which does not support the trial court's award of damages for two months. The record reveals that Dr. Springer saw Ms. Espree on August 16, 2006, and that he did relate her nasal and sinus irritation of two months to her exposure. There is no merit to CITGO's dispute regarding the duration of Ms. Espree's symptoms.[15]

*Wanda Anderson*

CITGO further contends that Dr. Springer testified to a symptom duration of only three weeks for Ms. Anderson, but the trial court awarded damages for ongoing symptoms at the time of trial. Ms. Anderson testified that she was still short-winded since her exposure. She said she had been an athlete,

---

[14]Darien's pain and suffering award was $12,000, while his mother's was $15,000.

[15]Ms. Espree's pain and suffering award was $10,000.

had never smoked, and that she was told at thirty-three that she had the lungs of a forty-six-year-old. She stated that her health had declined after the exposure, and it never came back. The trial court did not abuse its discretion in relying on this testimony, the MSDS on $H_2S$ and S02, and the testimony of other experts in determining the intensity and duration of symptoms.[16]

As previously stated, a trial court is not bound by expert testimony; the court has the power to substitute its own judgment and common sense for the conclusion of an expert witness where the evidence as a whole warrants doing so. *Ryan v. Zurich Am. Ins. Co.*, 07–2312 (La. 7/1/08), 988 So.2d 214. Moreover:

> "When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). If "a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." *Rosell*, 549 So.2d at 845.

*Taylor v. State, Dept. of Transp.*, 03-219, p. 15 (La.App. 3 Cir. 6/23/04), 879 So.2d 307, 318-19, *writ denied*, 04-1887 (La. 10/29/04), 885 So.2d 595; *See also Brown v. Georgia Gulf Lake Charles, LLC*, 12-635 (La.App. 3 Cir. 12/5/12), 104 So.3d 730.

V.

**CONCLUSION**

Based upon the foregoing, the judgment of the trial court is affirmed in all respects. Costs of this appeal are assessed to the defendant, CITGO Petroleum Corporation.

**AFFIRMED.**

---

[16]Ms. Anderson's pain and suffering award was $20,000.