# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 18-370 consolidated with CA 18-371, CA 18-372

**LEON J. ARCENEAUX, ET AL.**

**VERSUS**

**CITGO PETROLEUM CORPORATION, ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-2879 c/w 2007-3392 and 2007-3052
HONORABLE RONALD F. WARE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and Candyce G. Perret, Judges.

**AFFIRMED.**

**Robert E. Landry**
**Kevin P. Fontenot**
**Scofield, Gerard, Pohorelsky, Gallaugher & Landry**
**901 Lakeshore Drive, #900**
**Lake Charles, LA 70601**
**(337) 433-9436**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **CITGO Petroleum Corporation**

**Craig Isenberg**
**Kyle W. Siegel**
**Joshua O. Cox**
**Barrasso Usdin Kupperman Freeman & Sarver, LLC**
**909 Poydras, Ste 2400**
**New Orleans, LA 70112**
**(504) 589-9700**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **CITGO Petroleum Corporation**

**Marshall Joseph Simien, Jr.**
**Simien Law Firm**
**One Lakeshore Drive, Suite 1110**
**Lake Charles, LA 70629**
**(337) 497-0022**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **CITGO Petroleum Corporation**

**Wells Talbot Watson**
**Jake D. Buford**
**Bagget, McCall , Burgess, Watson & Gaughan**
**3006 Country Club Road**
**Lake Charles, LA 70605**
**(337) 478-8888**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
     **Rickey Haley**
     **Gardenia Amos**
     **Sara Stevens**
     **Bill Peltier**
     **Linda Harris**

**Richard Elliott Wilson**
**Somer G. Brown**
**Cox, Cox, Filo, Camel & Wilson, LLC**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
     **Sara Stevens**
     **Gardenia Amos**

**Linda Harris**
**Rickey Haley**

**Kirk Albert Patrick, III**
**Heath Savant**
**Donahue, Patrick & Scott**
**450 Laurel St., Suite 1600**
**Baton Rouge, LA 70801**
**(225) 214-1908**
**COUNSEL FOR DEFENDANT:**
**R & R Construction, Inc.**

**PERRET, Judge.**

This case is one of many stemming from the well-documented CITGO slop oil release and air release that occurred at its Calcasieu Parish Refinery on June 19, 2006. Defendant-Appellant CITGO Petroleum Corporation ("CITGO") appeals the trial court's judgment finding causation and awarding damages in favor of six Plaintiffs: Sarah Stevens, Linda Harris, Ricky Haley, Gardenia Amos, and Patrick Richard, individually, and on behalf of his minor son, Logan Richard. CITGO also appeals the trial court's judgment awarding Plaintiff Leon Arceneaux damages for fear of future injury. We affirm.

**FACTS AND PROCEDURAL HISTORY:**

On June 19, 2006, CITGO had two tremendous releases from its facility, an air release and a slop oil release. The slop oil release is at issue in this appeal. The supreme court in *Arabie v. CITGO Petroleum Corp.*, 10-2605, pp. 1-2 (La. 3/13/12), 89 So.3d 307, 310-11, summarized the event as follows:

> On the night of June 18 and the morning of June 19, 2006, southwest Louisiana experienced a severe rainstorm. As a consequence of the storm, the stormwater drainage and storage system, including the wastewater treatment facility, at the Lake Charles, Louisiana, refinery of defendant, CITGO Petroleum Company (CITGO), was filled beyond available capacity and overflowed, resulting in a major oil spill. The system was designed to collect the water used in day-to-day operations at the refinery and the runoff from most areas of the refinery due to rainfall.
>
> . . . .
>
> Over 21 million gallons of waste, including 17 million gallons of contaminated wastewater and 4.2 million gallons of slop oil, escaped from the two existing wastewater storage tanks into an area around the tanks which was surrounded by levees or dikes. . . . Of the 4.2 million gallons of slop oil which escaped, over 1 million gallons were released into the Calcasieu River. . . . The oil spill, which was described at trial as "major" and "catastrophic," eventually contaminated over 100 miles of shoreline along the Calcasieu River, and required several months to clean up.

CITGO's Material Safety Data Sheet ("MSDS") for slop oil, dated March 29, 2006, indicates that slop oil is amber to dark amber in color and has an odor similar to rotten eggs. Additionally, the MSDS states that slop oil is "Extremely Flammable and Poisonous" and that it "Contains Benzene – Cancer Hazard. Can Cause leukemia and other blood disorders." The MSDS explains that CITGO's slop oil is typically composed of eleven chemicals and describes the different signs and symptoms of acute exposure through inhalation, eye contact, skin contact, and ingestion, as well as the chronic health effects, conditions that may be aggravated by exposure, target organs, and the carcinogenic potential.

CITGO has stipulated to its fault in the release. Plaintiffs at issue in this appeal worked and socialized in areas they alleged the slop oil contaminated. They assert injuries as a result of their exposure to the toxic chemicals in the slop oil.

At trial, Plaintiffs gave live testimony. Expert testimony was submitted via video depositions and exhibits, which included prior trial testimony and prior depositions in the other CITGO litigation cases and expert reports. Plaintiffs' medical records, with the exception of the Richards, were also admitted into evidence.

On March 30, 2017, the trial court ruled in favor of Plaintiffs on causation and damages. In a judgment dated September 20, 2017, the court awarded expert fees, trial prep fees, and judicial interest from the date of judicial demand. It also awarded damages to Plaintiffs as follows:[1]

---

[1]The damages mentioned are only for those Plaintiffs currently on appeal. The trial court also awarded damages for nine other plaintiffs whose damages CITGO is not appealing. With the exception of Leon Arceneaux's fear of future illness award, CITGO is not appealing the exposure cases of any Plaintiffs who worked at Calcasieu Refining Company ("CRC") at the time of the spill or who were involved in the clean-up.

- **Leon Arceneaux** was awarded $40,492.00, which accounts for pain and suffering ($23,000.00), loss of enjoyment of life ($10,000.00), fear of future illness ($7,000.00), and medical expenses ($492.00). Only the award for fear of future illness is challenged on appeal.

- **Sarah Stevens** was awarded $36,150.00, which accounts for pain and suffering ($21,000.00), loss of enjoyment of life ($5,000.00), fear of future illness ($10,000.00), and medical expenses ($150.00).

- **Ricky Haley** was awarded $8,200.00, which accounts for pain and suffering ($6,000.00), loss of enjoyment of life ($2,000.00), fear of future illness ($0.00), and medical expenses ($200.00).

- **Linda Harris** was awarded $52,200.00, which accounts for pain and suffering ($32,000.00), loss of enjoyment of life ($10,000.00), fear of future illness ($10,000.00), and medical expenses ($200.00).

- **Patrick Richard** was awarded $7,000.00, which accounts for pain and suffering ($4,000.00), loss of enjoyment of life ($3,000.00), fear of future illness ($0.00), and medical expenses ($0.00).

- **Patrick Richard for the benefit of his minor son, Logan Richard**, was awarded $4,000.00, which accounts for pain and suffering ($3,000.00), loss of enjoyment of life ($1,000.00), fear of future illness ($0.00), and medical expenses ($0.00).

- **Gardenia Amos** was awarded $41,400.00, which accounts for pain and suffering ($25,000.00), loss of enjoyment of life ($6,000.00), fear of future illness ($10,000.00), and medical expenses ($400.00).

CITGO filed a motion for suspensive appeal, which the district court granted, and timely posted bond on October 18, 2017. CITGO now appeals asserting three assignments of error:

1. The [trial] court erred in finding that six of the plaintiffs [Sara Stevens, Ricky Haley, Linda Harris, Patrick Richard, Logan Richard, and Gardenia Amos,] proved causation, because they failed to present expert testimony or other objective evidence that they were exposed to chemicals released by CITGO.[] Plaintiffs' unscientific testimony about detecting an unusual odor or seeing an oily substance in the water, and experiencing common symptoms such as headaches or sinus congestion, is insufficient, in the

3

absence of expert testimony, to establish exposure to CITGO's chemicals.

2. The [trial] court erred in awarding damages for fear of future illness to two plaintiffs – Leon Arceneaux and Gardenia Amos – who did not testify that they had any fears or concerns for their future health. These awards should be reversed based on the lack of any supporting evidence.

3. The [trial] court erred in awarding damages for loss of enjoyment of life to five plaintiffs, [Ms. Harris, Ms. Amos, Mr. Haley, Mr. Richard, and Logan Richard,] because they did not testify or offer any other evidence about whether and how their quality of life diminished because of their alleged exposure-related injuries.[] These awards should be reversed based on the lack of supporting evidence.

**DISCUSSION:**

On appeal, this court may not set aside a trial court's factual findings absent manifest error or unless the trial court was clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). To reverse a trial court's factual findings, the appellate court must apply a two-tiered test when reviewing the facts and must find that (1) the record does not establish a reasonable factual basis for the finding of the trial court, and (2) "the record establishes that the finding of the trial court is clearly wrong (manifestly erroneous)." *Bradford v. CITGO Petroleum Corp.*, 17-296, p. 4 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, 658-59, *writ denied*, 18-272 (La. 5/11/18), 241 So.3d 314. However, "[i]f the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse." *Arabie*, 89 So.3d at 312. Thus, "when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous." *Id*.

4

**Assignment of Error Number One:**

In its first assignment of error, CITGO argues that the six non-CRC (Calcasieu Refining Company) Plaintiffs did not prove causation. CITGO argues that Plaintiffs failed to present expert testimony or other objective evidence that they were exposed to chemicals released by CITGO and that the alleged exposure was the cause of their symptoms. Additionally, CITGO argues that Dr. Steve Springer's medical causation testimony does not establish exposure, but instead assumes exposure. Finally, CITGO argues that Plaintiffs were in locations where exposure to CITGO's slop oil was implausible and that the evidence is undisputed that oil did not arrive where Plaintiffs were located.

In *Arabie*, 89 So.3d at 321, the supreme court explained that "[t]he test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by the accident." Causation is a factual finding subject to the manifest error standard of review. *Bradford*, 237 So.3d 648. In *Bradford*, 237 So.3d at 659 (citations omitted), this court explained: "Proof of causation in toxic tort cases has two components, general and specific. 'General causation' refers to whether a substance is capable of causing a particular injury or condition in the general population, while 'specific causation' refers to whether a substance caused a particular individual's injury." After a review of various cases, this court concluded that the "cases only establish that expert testimony on causation is required." *Id*.

CITGO suggests that this panel should not follow *Bradford*, 237 So.3d 648 in determining whether causation was sufficiently proven, arguing that the *Bradford* decision conflicts with earlier jurisprudence requiring expert testimony in

chemical exposure cases for both general and specific causation. Additionally, CITGO argues that the *Bradford* decision incorrectly finds that Dr. Springer's expert testimony satisfied the specific causation requirement because his medical opinions assumed that exposure was established.

In *Bradford*, general causation was established by Dr. Barry Levy, the plaintiffs' occupational and environmental health physician and epidemiologist expert. Dr. Levy testified via prior deposition and trial testimony regarding numerous epidemiology studies that involved people working around or living in the vicinity of oil spills to help explain the association between exposure and symptoms of exposure. Mr. Frank Parker, the plaintiffs' industrial hygienist expert, was also submitted as a general causation expert. Mr. Parker testified regarding the toxicity of the chemicals spilled, how they are released, and the symptoms and health effects that occur in people who are exposed to those chemicals. Finally, the *Bradford* court reviewed CITGO's MSDS and significant events reports, which it used to establish the parameters of the CITGO release. To establish specific causation, the plaintiffs submitted their own testimony as well as medical testimony from Dr. Robert Looney and Dr. Steve Springer, who related the plaintiffs' symptoms to slop oil exposure.

Similarly, this court in *Broussard v. Multi-Chem Group, LLC*, 17-985, p. 34 (La.App. 3 Cir. 7/11/18), __ So.3d __,[2] reviewed evidence "in the face of limitations in the available data" as Multi-Chem failed to conduct sufficient air monitoring of a release following an explosion at the Multi-Chem facility. This court reviewed expert testimony regarding the amount and nature of the chemicals stored at the facility; expert testimony regarding the direction of the smoke plume

[2]2018 WL 5116943.

6

generated by the explosion; expert testimony that if a plaintiff smelled or tasted the smoke or chemicals and thereafter suffered from certain symptoms, those plaintiffs were likely exposed to the chemicals; the plaintiffs' testimony regarding their symptoms, location, and experience; and medical expert testimony regarding causation for those plaintiffs who sought medical treatment. Thereafter, this court affirmed the finding of causation.

The supreme court has denied writs on the *Bradford* decision. We find no error with the *Bradford* court's analysis of the jurisprudence on causation. Therefore, reliance on *Bradford* is not misplaced.

As in *Bradford* and *Multi-Chem*, Plaintiffs in this case provided expert testimony establishing general causation and provided medical testimony establishing specific causation. Furthermore, each Plaintiff testified regarding when they were exposed to the slop oil and their contemporaneous or near-contemporaneous symptoms, which are consistent with those expected from slop oil exposure, as Plaintiffs' experts previously testified.

Mr. Parker testified regarding general causation and exposure through his prior trial testimony, depositions, and reports. He testified regarding how far the slop oil and wastewater traveled, the hazardous nature of the chemicals in the slop oil, and the procedures that CITGO should have implemented at the time of the release. Although Mr. Parker issued a report dated December 6, 2016, discussing his opinions regarding the CRC plaintiffs, he did not address the non-CRC Plaintiffs at issue on appeal.

Mr. Parker did not specifically opine on Plaintiffs' locations in this case. However, Mr. Parker's April 28, 2016 deposition, taken in lieu of live testimony for the *Bradford* case, was admitted into evidence. In the *Bradford* deposition, Mr.

Parker agreed that it took approximately two days for an oil sheen to reach CRC, which was roughly two to two and a half miles south of CITGO, and that heavier parts arrived sometime around June 23, 2006. Additionally, Mr. Parker agreed that he previously opined that oil product reached Talens Marine, roughly four to four and a half miles south of CITGO, several days after the release. He also recalled that the oil remained around CRC for three to four weeks. Furthermore, although pressed by defense counsel, Mr. Parker would not give an opinion regarding when the oil travelled beyond the mouth of the Indian Marias. He did admit, based on the documents in the record at the time of his deposition, that he did not see any evidence that slop oil migrated north of the I-210 bridge. However, it was also Mr. Parker's understanding that CITGO controlled the monitoring of the release, what to monitor, and what information was given out regarding the release.

Upon reviewing a colored map showing the different degrees of oil found in the area, Mr. Parker noted that, as of July 3, 2006, there was moderate oil on the east side of the I-210 bridge as well as moderate oil at Prien Lake. However, he was unable to form an opinion regarding when the oil reached these locations because he had not seen any documents reporting that information.

Additionally, Mr. Parker's report written for the *Cormier* trial, and admitted into evidence in this case, noted that no waste oil from CITGO was reported in the I-210 area or Big Lake area, but he also clarified that he did not doubt the plaintiffs' reports of smelling an odor or experiencing symptoms consistent with slop oil exposure. Instead, he could not provide an opinion concerning the significance of their exposure at that time.[3]

---

[3] Specifically, Mr. Parker opined as follows:

Mr. Parker also opined on slop oil's composition, toxicity, and characteristics during his April 28, 2016 *Bradford* deposition. Mr. Parker explained that slop oil is a complex mixture of chemicals without an exposure standard. CITGO recommended fresh air breathing protection if there was any potential exposure to slop oil. Importantly, he explained that when you smell benzene, you have been overexposed. Specifically, he stated:

Q. And if you smell benzene, you're overexposed; right?

A. Yes, no question about that.

Mr. Parker further likened how benzene reacts in slop oil to sugar in iced tea; it does not become absorbed into the water but instead still exists as benzene. Therefore, when the water is exposed or disturbed, the benzene will start to "evolve off of the water" and droplets of mist containing the chemicals are released anew. Mr. Parker also explained that slop oil would have the sheen people typically relate to oil in water, but it would also appear as a mousse, which is a mixture of the slop oil, water, and air. Furthermore, due to this mousse consistency, the hazardous material would not necessarily be liberated early in the release; instead, it is a continuing problem.

Mr. Parker notes that his opinion regarding the release of chemicals in slop oil is consistent with CITGO's spill-related reports he reviewed showing high peak

8. Mr. Boutte was working several miles up the river from the Indian Marias where the waste oil entered the Calcasieu River. I find no reports that significant waste oil contamination from the CITGO release made it to his location. This was a massive release which exposed the entire region to vaporous emissions so I have no doubt that Mr. Boutte's testimony is true. However, I cannot form any opinion at this time concerning the significance of his exposure; and

9. [redacted] were fishing under the I-210 Bridge also several miles upstream from the Indian Marias. While they report a "film" and an "oily sheen" on the water I find no reports that significant waste oil contamination from the CITGO release made it to their location. I do not doubt their testimony concerning what they saw and smelled. However, at this time I cannot form an opinion concerning the significance of their exposures.

days later on, such as a nine parts per million reading of benzene taken on the Sea Bolt Trader ship on June 22, 2006, CITGO's industrial hygienist's documents showing peak VOCs [volatile organic compounds] and peak H2S [hydrogen sulfide] levels around the Fourth of July, and reports of higher readings for chemicals later in the clean-up process.

Additionally, Mr. Parker stressed that the concern in the slop oil release is not only benzene, but all the other chemicals making up the slop oil. The body is not only exposed to volatile chemicals but can be exposed to everything in the mixture when that mixture is disturbed and, for example, results in a mist. In reaching his opinion, Mr. Parker reviewed a document dated July 12, 2006, nearly three weeks after the release, in which a PAH [polynuclear aromatic hydrocarbons] odor and sheen was described. Mr. Parker explains that PAHs are big molecules and components of slop oil; many are known carcinogens. When the soil was probed in mid-July, there was a PAH odor, which is consistent with his opinion that once something is contaminated, it is never all recovered, and also consistent with his opinion that the body may be exposed to volatile chemicals when the mixture is disturbed.

Mr. Parker further noted that workers within the plant generally withstand more exposure than people in the community. Additionally, there is a concept called "individual susceptibility" which acknowledges that some people are more susceptible to certain insults than others.

Dr. Levy testified regarding general causation through a prior deposition, trial testimony, and reports. He explained the symptoms expected in individuals exposed to a slop oil release and supported his opinion with a plethora of scientific

10

literature. In forming his opinions, Dr. Levy looked at studies related to the health outcomes and health risks of petroleum spills.

For example, Dr. Levy reviewed the effects of the Tasman Spirit oil spill on the residents of Karachi, Pakistan, and Dr. Levy opined that the court could look at this study to support general causation for what type of problems are caused by petroleum spill exposure. The study reported that six weeks after the spill, a smell was still perceptible approximately one kilometer away. Dr. Levy noted that, following the spill, those residents reported symptoms including skin irritation, nausea, headaches, dizziness, irritability, fatigue, and eye and respiratory symptoms.

He also looked at the Prestige oil spill study which found headaches, dizziness, eye and throat irritation, and respiratory problems were reported by the crude oil clean-up workers after the spill. These acute effects are similar to and consistent with those of other spills. A follow-up study of the Prestige spill reported respiratory problems five years later.

Dr. Levy further agreed that each individual's susceptibility to a release varies, and people react differently for certain environmental effects. This was consistent with Mr. Parker's testimony.

Plaintiffs also submitted testimony from Dr. Steve Springer and Dr. Robert Looney. Dr. Looney testified to general causation via his March 6, 2015 deposition in the *Cormier* case. Dr. Looney practices occupational medicine and has experience in the fields of general, environmental, and occupational medicine. In forming his opinions on general causation, he reviewed several versions of CITGO's MSDS for slop oil, medical records, the deposition of CITGO's toxicologist, Dr. Kenneth Washburn, and scientific literature related to petroleum

11

spills. He opined that there were four reasons for his conclusion that the slop oil release caused injuries: (1) "Scientific studies support the fact that chemical[s] released by Citgo cause injury[,]" (2) The MSDS from Citgo also "indicates strong evidence that the release was toxic[,]" (3) "The fact that so many statements from victims were so similar[,]" and (4) "The timing of [the] onset of symptoms was very strong evidence." Additionally, in response to the question, whether "the only real way to determine a person's actual exposure was through personal monitoring," he stated that:

> A. You can't tell what they were exposed to without personal monitoring or the amount of exposure but by history of several ways in history that you do -- for instance, these people were exposed to a particular substance. If that substance was present in their presence at that time, then I think – and their symptoms pertains to that, I think it's reasonable to come to the conclusion that it was a cause and effect.

Furthermore, Dr. Steve Springer testified by video deposition regarding each Plaintiff to establish specific causation. In forming his opinions about each Plaintiff, Dr. Springer considered CITGO's MSDS, the symptoms and medical history reported by each Plaintiff, Plaintiffs' depositions, medical records, as well as his own observations during their appointments. When Plaintiffs came to see Dr. Springer, most for a pulmonary function test, they also completed personal information sheets that asked what symptoms each experienced and how long those symptoms lasted.[4] All opinions given by Dr. Springer were to a reasonable degree of medical probability. Dr. Springer's testimony regarding each Plaintiff will be discussed along with the Plaintiffs' testimony below.

---

[4] Mr. Richard and Logan Richard did not meet with Dr. Springer, but Dr. Springer did provide an opinion regarding their symptoms.

The Slop Oil MSDS admitted into evidence notes that slop oil is "Extremely Flammable and Poisonous," that it smells of rotten eggs, that it contains hydrogen sulfide gas, and may be fatal if inhaled. The MSDS warns: "Harmful or fatal if swallowed - Can enter lungs and cause damage" and "Contains Benzene-Cancer hazard. Can cause leukemia and other blood disorders." The MSDS explains that if inhaled, "the gas or vapor may cause severe nose, throat, respiratory tract, and lung irritation . . . . Symptoms are characterized by coughing, choking, or shortness of breath. Breathing this material may cause central nervous system depression with symptoms including nausea, headache, dizziness, fatigue, drowsiness, or unconsciousness." If it comes into contact with the eyes, "[t]his material can cause eye irritation with tearing, redness, or a stinging or burning feeling." The MSDS also explains that slop oil can cause skin irritation, "with redness, an itching or burning feeling, and swelling of the skin."

Plaintiffs testified regarding their location, what they saw, and their symptoms they experienced. Additionally, medical records for each Plaintiff were admitted into evidence.

Sara Stevens:

Sara Stevens was working for Arrowtech-BFE at the Gilliam Dump on John Ledoux Road. Her primary responsibility was to inspect trucks coming in to dump hurricane debris at the site. Ms. Stevens testified that she recalled arriving at work one day and smelling "a distinctive odor." She further testified: "I couldn't explain what it was, [][my] eyes started itching, throat itched, real watery. Just - - just didn't feel right." She does not recall the date she first noticed the smell. Ms. Stevens testified that after arriving at work and noticing the distinct smell, she suffered from watery eyes that afternoon and a migraine the following day. She

13

recalled smelling the odor for approximately three days, distinctively, and testified that the odor gradually dissipated. She recalls positively having symptoms for those three days. Ms. Stevens also explained that the Gilliam Dump had canals or ditches on its sides and in those waterways she "observed an oily substance, sludge-like oily substance." However, Ms. Stevens admits that she has no knowledge regarding whether the canals/ditches surrounding the Gilliam Dump connect to the Calcasieu River.

Ms. Stevens was treated for her symptoms by Dr. Springer beginning in August of 2006. Her chief complaints and symptoms were severe migraine headaches, watery eyes, itchy throat, dizziness, trouble sleeping, and feeling run down, which she described as fatigue at trial. She reported to Dr. Springer that she noted a gassy smell and oil in the water. She had a follow-up exam with Dr. Springer in February of 2007, concerning her headaches, insomnia, and anxiety. At trial, she still complained of sinus problems and headaches. Although her headaches were less frequent, her sleeping issues had not resolved. When explaining when her anxiety occurs, she stated, "Only when it cross [sic] my mind, when I'm thinking about if I - - if, you know, the long - - if I got to go to the doctor, what they'll find, something like that."

Dr. Springer noted that "[a]t the time of that 08/18/06 visit, she basically was really complaining of insomnia but at around the time of the release, she related a different - - or a different set of review of systems, basically, which just said that she had had some sleep disturbances, and feeling worn down since the exposure." Additionally, he notes the records indicate "her eyes were watering that afternoon after the exposure, that for a couple of days after the exposure and lasted for about three days. She had some sore throat and cough, and that the migraines, the next

day after the smell, she was kind of having some headaches there." Ms. Stevens returned to Dr. Springer in February of 2007, for headaches and insomnia, but Dr. Springer notes she had reported to Moss Regional for migraines in the interim.

As to the duration of her symptoms, Dr. Springer opined that Ms. Stevens reported migraine headaches from the day after she smelled an odor at work through her February visit. Dr. Springer also explains that "insomnia is an awful instigator of headaches" and just because Ms. Stevens did not report a headache every time, "obviously, everybody doesn't have a headache every day, but migraines are moody[.]" Dr. Springer further recalls Ms. Stevens related that she had a sore throat and cough for a couple of days after the exposure and those complaints "eventually went away about three days." Additionally, Dr. Springer opined that Ms. Stevens indicated on her March of 2007 personal information sheet that she experienced shortness of breath at the time of exposure. Dr. Springer admits this is inconsistent with her records from August of 2006: "she recorded in one spot and not in another." However, it is not out of the question to consider shortness of breath relatable to the exposure because "she was having cough and sore throat" and "that's a reasonable medical opinion that she had shortness of breath associated with the smell. Many of the people did." As to the shortness of breath he opined, "I think it would be more consistent to say it lasted for two to three days, around the time that she was having the cough." Finally, Dr. Springer would relate all of the symptoms Ms. Stevens reported at her initial August of 2006 visit with him to her exposure to CITGO's slop oil.

Linda Harris:

Linda Harris was also working at the Gilliam Dump like Ms. Stevens. Ms. Harris explained that much of her job was done from a tower, but that she would

15

go down to the street as well.  Ms. Harris explained why she believed she was exposed to the slop oil chemicals:

> Q. Could you explain to the Court why you believe you were exposed and suffered injuries?
>
> A. Because it happened so sudden.  It was like one day I was fine, cheerful self; and then all of a sudden, I was just deathly ill, vomiting, diarrhea, nosebleeds. . . . This was all of the above all together.
>
> I knew something was wrong because I started having cramps.  Like my muscles in my arms and my legs would just tense up and cramp up where I just couldn't move.  So I went to the doctor[.]

Ms. Harris recalls having abdominal pains; diarrhea; itching on her hands, legs, and feet; nosebleeds; and itchy eyes.  Although Ms. Harris does not recall the date she alleges she was exposed, she does remember that it rained the day before her symptoms began, and she remembers seeing a film or substance in the water the following day.  Ms. Harris, like Ms. Stevens, testified that the dump had canals or ditches around it.  She described the ditch: "I call it a ditch.  There's a ditch that runs in front of the dump.  They had boards that they had put across so that you could either walk across or you could drive across [.]"  Additionally, she testified that:

> On the - - I don't know north, south, east, west right now, but on the other side, there was a canal.  And when I say "canal," it was bigger than the ditch. . . .  So we were surrounded by water on both sides, because there was water in the canal all the time[.]

Furthermore, like other Plaintiffs, Ms. Harris recalled that it rained:

> A. . . . [B]ut it rained the day before all of this started, and both of the canals were full. . . .
>
> Q. And when you say "before it all started," are you referring to your symptoms or - -
>
> A. My symptoms and what we saw.

Ms. Harris continued to testify regarding what she saw after the rain: "There was a film, like, in the - - a film substance that was on top of the water." She testified that she had a habit of taking her safety boots off when getting into her car, and that the day her symptoms began, she noticed that her hands started itching on her drive home. Additionally, she recalled seeing people in what she described as hazmat suits at the lake near the dump a few days after she was first sick. Unlike the other Plaintiffs, Ms. Harris does not recall a particular odor at the time she believes she was exposed, but explained, "When you work at a dump, it's - - you smell different smells all the time. So I can't say that I smelled anything different."

Ms. Harris testified that she went to Women and Children's Clinic. The treating physician believed her symptoms indicated food poisoning, despite the fact that Ms. Harris did not recall eating food that day. Ms. Harris also testified that her nose continued to bleed almost every day, though her medical records do not indicate she complained of a nose bleed until January of 2007. At trial, Ms. Harris testified that the nose bleeds started before that January visit. When she returned to Monroe, her hometown, her doctor, Dr. Qayyum, assessed her with acute sinusitis, and sent her to an ENT, Dr. Barham, for her nose bleeds. Dr. Barham cauterized the blood vessel in her nose in 2007, though she testified that her nose still bled regardless. Ms. Harris also testified that she saw Dr. Altick for blisters and a rash on her hands and feet.

Although the Women and Children's records reveal that her visits were not until July 16 and 18, 2016, that her chief complaint at that time was nausea and diarrhea, and that she complained of getting too hot at work, Ms. Harris testified that there were additional visits related to the exposure and that she did in fact

17

receive medical care in June. Additionally, Ms. Harris explained that she did not report every symptom to Dr. Qayyum, such as her skin rash, because she was treating with Dr. Altick for that issue. Similarly, she explained that she did not report each symptom every time she went to the doctor because she had already complained about them in the past.

As to the length of her symptoms, Ms. Harris testified that she experienced headaches for months, itchy eyes for months, nosebleeds for years, vomiting and diarrhea for a couple of weeks, and that she continued to have a skin rash at trial, which comes and goes. Ms. Harris also specifically expressed a fear of future injury.

Ms. Harris' Family Medical Center records showed a history of nose bleed complaints following the slop oil release as well as an early August visit for ear pain, sinus drainage, headaches, and acute sinuses. Another Family Medical Center record shows Ms. Harris reported for an injection on September 29, 2006, and that the doctor checked off abnormal "ENT" on that date. Her records reporting her nose catherization were also admitted. Dr. Springer reviewed Ms. Harris' deposition and medical records before providing a report of his opinion. At Dr. Springer's deposition, he was missing the personal information sheet for Ms. Harris that each Plaintiff filled out when they reported to him for a pulmonary function test. Regardless, he recalled her complaints of nosebleeds and opined nosebleeds can result from respiratory irritation and inflammation, which is on the MSDS sheet for slop oil. He further opined that the fact that Ms. Harris did not report nosebleeds at her July emergency room visits does not change his opinion because emergency room physicians are very focused on the main complaint of the patient, which for Ms. Harris was vomiting and diarrhea. Dr. Springer related Ms.

18

Harris' nosebleeds and the other immediate symptoms she experienced to slop oil exposure.

Ricky Haley:

Ricky Haley was working at the Port of Lake Charles around the time of the slop oil release, which is just north of L'Auberge Casino and Resort. Mr. Haley was engaged in longshoreman work, which consisted of loading ships under their decks. On the day of his alleged exposure, Mr. Haley recalls coming up from under the deck of the ship and smelling an odor. However, he does not recall the specific date that this occurred. At trial Mr. Haley testified:

> Q.   . . . Could you tell the Court why you believe that you suffered injuries as a result of that oil spill?
>
> A.    Because we smelled some kind of odor when we came out the ship to go to lunch. And we smelled - - we smelled some kind of - - I don't know what kind of odor it was. Then I got - - end up going back to work after lunch and then started getting, like, headaches and I got nausea [sic] and I kind of - - when I went back home and ate that evening, I kind of couldn't even eat. Lost my appetite.

Mr. Haley testified that he had trouble tasting, was vomiting, and had headaches for approximately two and a half to three days. At trial, he admitted to not having any future concerns about his exposure to the oil spill.

On cross-examination, defense counsel focused on when Mr. Haley smelled the odor. On his personal information sheet for Dr. Springer, Mr. Haley wrote that he worked for the Port of Lake Charles since July 17, 2006. However, at trial, Mr. Haley testified that he switched back and forth between employers and only worked for the Port of Lake Charles when ships came in. He also testified that he had worked for the Port of Lake Charles since the early nineties.

Mr. Haley reported to Dr. Springer in March of 2007, for a pulmonary function test. On his personal information sheet, Mr. Haley indicated he experienced shortness of breath and a sore throat at the time of the release; sexual dysfunction for three months; and dizziness, headaches, sleep problems, coughing/wheezing from the time of the release until the day of the appointment. Dr. Springer related all symptoms to the exposure but specified he would only relate six to eight weeks of the gastrointestinal symptoms to the exposure. However, Mr. Haley's trial testimony was that his symptoms resolved within a few days. The trial court noted this discrepancy in its oral reasons. Mr. Haley's information sheet indicates he sought treatment at Jennings American Legion, St. Patrick Hospital, and Women and Children's for chest pain. Dr. Springer only relates Mr. Haley's chest pain experienced within one week of his exposure to the slop oil release. Dr. Springer agreed that if Mr. Haley was close enough to smell a strong odor, then he was close enough to have symptomatology as a result of exposure. Dr. Springer's report further opines, "to a reasonable degree of medical probability, that Mr. Haley's reports of congestion, dizziness, headaches, and nausea/vomiting/gagging are all related to his exposure to slop oil in June 2006. It is also my opinion that the reports of chest pain are, to a reasonable degree of medical certainty, also related to the symptomology from the exposure."

Patrick Richard and Logan Richard:

Patrick Richard testified regarding his exposure and symptoms as well as those of his minor son, Logan Richard. Mr. Richard explained that around the Juneteenth holiday, he and his son, who was three at the time, were at the I-210 beach playing in and around the water. Soon after, both began experiencing irritated and burning eyes. He testified that they were at the beach for an hour,

20

maybe more, and "we started - - eyes got a little - - started getting irritated, you know. Throat burning a little bit, you know, just didn't know what was going on, so we just - - we just decided to leave." At the time, Mr. Richard was unaware of the Citgo releases. He did not seek medical treatment for himself or his son, but instead decided to self-treat. Mr. Richard explained that he "didn't know at the time that they had a spill or anything" so he self-treated with "just basic things, you know, Tylenol when you get back, you know." He further stated that he "didn't really think much of it at the time." It was not until a few months later that Mr. Richard learned by word of mouth that the slop oil release had occurred. He estimates his symptoms, which included watery eyes, burning nose, itchy throat, and headaches, lasted about two to three weeks, and his son's symptoms lasted about one to two weeks.

Dr. Springer reviewed the deposition of Mr. Richard to provide an opinion regarding the relationship of Mr. Richard and Logan's symptoms to the slop oil release. There were no medical records for Dr. Springer to review, and Dr. Springer did not evaluate them personally. Dr. Springer recalled Mr. Richard testified that the family was at the I-210 beach on or around July 21, 2006, when they smelled a foul smell that burned their nose and made them nauseous. Their symptoms resolved within a few weeks and Mr. Richard treated the symptoms with aspirin and Pepto. Mr. Springer opined "to a reasonable degree of medical probability that their headaches and nausea regarding that and him and his children, were related to that foul smell they noted there in June."

Gardenia Amos:

Gardenia Amos was working for the Port of Lake Charles around the time of the slop oil release. She believed that she was exposed while working at Bulk

Terminal 1 at the Port of Sulphur. Her responsibilities included keeping up with the yard work by cutting grass and weed eating, including along the water. Although she does not recall the date of her alleged exposure, she does remember the moment she went "through a gate, something was so strong in the - - in the air, and all - - I couldn't stop sneezing. And all of a sudden, my nose start [sic] bleeding, and I start coughing up blood." She recalled: "I felt dizzy. I mean, I really - - I just didn't feel the same. . . . I was cutting along the water and weedeating [sic] along the water, along the track and everything, and, I mean, I start breaking out in a rash." Ms. Amos testified that she took herself to the hospital but does not recall whether it was that same day. She recalls the alleged exposure occurring around the time she went to the hospital and that it was "pouring down rain" when she went. It was a few days later that she learned of the slop oil release.

Ms. Amos's medical records show a July 26, 2006 visit to Christus St. Patrick's Hospital for chest pain, diaphoresis, cold sweats, and nausea. Although Ms. Amos asserts that she also visited Moss Regional in July, the medical records show that the visit to Moss Regional was in January of 2007.

Ms. Amos saw Dr. Springer in March of 2007, for a pulmonary function test and complained in April of 2007, about a rosacea-like rash that "comes and goes" that she related to her exposure. Dr. Springer explained that Ms. Amos reported symptoms including dizziness, headache, shortness of breath, cough or wheezing, eye irritation, and skin rash that she believed started around June 19, 2006. Dr. Springer recalled that Ms. Amos reported that she saw Dr. Kang for sinuses a few days after the release, and possibly for respiratory complaints. Dr. Springer opined that the fact that Ms. Amos did not previously mention her rash to other providers

is not unusual considering her main complaint at those times was chest pain. Regarding her rash, Dr. Springer testified that Ms. Amos had a significant malar rash across the bridge of her nose, between the eyes, and on her forehead. He explains that rosacea flare-ups can be caused by stress, so if she is stressing about her exposure to the chemicals, it can cause long term flare ups. However, Dr. Springer did admit on cross-examination that there are lots of other causes of rosacea.

Dr. Springer additionally related one visit regarding Ms. Amos's chest pain to her exposure, noting that it was musculoskeletal in nature and caused by inflammation behind the chest, which can occur when one is coughing, wheezing, or experiencing shortness of breath. Dr. Springer further explained that one can have continued chest pain caused by coughing, wheezing, or shortness of breath, even though the initial cause has long subsided. Therefore, his relation of Ms. Amos's chest pain to the exposure is supported by Ms. Amos's reported symptoms and the diagnosis of musculoskeletal chest pain from St. Patrick's on July 26, 2006.

After considering Ms. Amos's medical history, complaints, deposition and location, as well as her activities on the day of her alleged exposure, Dr. Springer opined that her sinus issues from the date of the exposure through July 10, 2006, when she saw Dr. Kang were related to her exposure to slop oil; her chest pain through July 26, 2006, is related to her exposure to slop oil; and her rash through her last appointment with hm on April 20, 2007, is related to her exposure to slop oil.

Based on the above testimony and evidence, we find that Plaintiffs provided expert testimony on general causation through Mr. Frank Parker, Dr. Berry Levy,

and Dr. Looney on the expansiveness of the release and those symptoms that would generally be expected following exposure to a slop oil release. Although CITGO argues that there is no expert testimony that Plaintiffs were exposed to slop oil, let alone harmful levels of slop oil, we disagree. Dr. Levy testified that no level of benzene is safe, and Mr. Parker opined that if one smells benzene, they are overexposed. Plaintiffs testified to seeing an oily sheen and smelling a distinct odor nearly contemporaneous with the onset of their symptoms, symptoms that are listed on CITGO's Slop Oil MSDS.

Plaintiffs also provided specific causation through medical evidence provided by Dr. Springer as well as medical records of other treating physicians. Dr. Springer's opinions were supported by CITGO's MSDS sheet for slop oil, which warns of the same symptoms complained of by Plaintiffs. Additionally, Plaintiffs' testimony regarding the contemporaneous or near-contemporaneous onset of their symptoms and to their experience of seeing an oily sheen in nearby water or smelling a distinct odor further supports Dr. Springer's opinions. Several Plaintiffs even recalled a recent rain prior to the odor and the onset of their symptoms.

Plaintiffs further testified regarding where they were working or socializing when they smelled an odor, saw oily substances, and began experiencing symptoms. In its oral reasons for ruling, the trial court stated that it found Plaintiffs "very credible and plainspoken about what happened to them following their exposure. The sheer consistency of their testimony is striking as well as compelling."

The trial court was also given the July 3, 2006 map showing the extent of the release, as well as CITGO's Significant Event Report describing comments and

complaints regarding the release. There appears to be no map compiling oil locations prior to July 3, 2006, in the record. It was also testified to that CITGO controlled the information that was generated in determining the vastness of this release. Although Plaintiffs could not recall the exact dates of their exposure, the trial court had significant circumstantial evidence to tie Plaintiffs' exposure to the release. Accordingly, we find no manifest error in the trial court's finding on causation as to these Plaintiffs.

**Assignment of Error Number Two:**

In CITGO's second assignment of error, CITGO argues that no evidence or testimony was admitted to support damage awards for fear of future illness to Mr. Arceneaux or Ms. Amos and, therefore, asserts those awards should be reversed. Although general damage awards are reviewed for an abuse of discretion on appeal, testimony regarding a fear of future injury is necessary to establish the evidentiary basis for such an award. *See Broussard*, __ So.3d __ (where residents who did not specifically testify regarding fear of cancer did not establish an evidentiary basis for such an award), and *Arabie*, 89 So.3d 307 (where each plaintiff testified to a fear of contracting cancer).

Mr. Arceneaux passed away prior to trial, however, his wife testified on his behalf. Mr. Arceneaux was an employee of CRC, which became surrounded by slop oil following the release. Much of Mrs. Arceneaux's testimony was objected to as hearsay, but she did properly testify that, in her opinion and experience, Mr. Arceneaux was not one who went to the doctor or complained often. She recalled that, following the release, he was careful not to mix his work clothes with other clothes in the wash. Additionally, she testified that he was not typically a worrier, but that after the release, his mood changed in terms of worrying. Specifically:

Q. Ms. Arceneaux, was L.J. [Mr. Arceneaux] generally a worrier?

A. No.

. . . .

Q. And so - - and to answer that question, after this exposure, did his mood, in terms of worrying, change?

A. Yes.

The trial court awarded Mr. Arceneaux $7,000.00 for fear of future illness. In its oral reasons for ruling, the trial court stated, "fear of future illness is supported by the direct testimony as well as some indirect circumstantial evidence by Mrs. Arceneaux saying that he became a worrier and he was careful not to mix the clothes together . . . while washing, and it caused him some concern that was obvious to her." We find no abuse of discretion in this award.

Regarding Ms. Amos, CITGO argues that the trial court improperly awarded $10,000.00 for fear of future illness. Ms. Amos testified that for some period of time she did fear that the exposure caused her heart-related issues:

Q. All right. Now, I know over the years, you know, before '06 and until now, I mean, you've had a lot of visits to the hospital and treatment - -

A. Yes.

Q. - - for heart-related issues, correct?

A. Correct.

. . . .

Q. All right. Now, I know that that was a major concern for you, so we talked about Dr. Springer's testimony when he gave a deposition in this matter for trial, correct?

A. Correct.

26

Q.     And you understand that you had two visits.  You had a visit in July to Moss Regional, and you had a visit in July to St. Pat's, - -

A.     Right.

Q.     - - right?  And at one of them, you had complaints of chest pain?

A.     Correct - - correct.

. . . .

Q.     And in this deposition . . . he had an opportunity to look at all your medical records and all the complaints that you had, and he limited your chest pain up to that July visit in '06 to be related, said after that, it appeared that it was more of your family history and other heart problems.

A.     Uh-huh.

. . . .

Q.     Now, with Dr. Springer giving some testimony about the heart condition, does it kind of alleviate your concerns that the oil spill contributed to your heart condition?

A.     Yes.

Ms. Amos testified that "it kind of" alleviated her concerns that the oil spill contributed to her heart condition, not that she had no ongoing concerns.

Although Ms. Amos had a history of family heart disease and was already having some heart issues before the release, at the time of her July 2006 visit to Christus St. Patrick Hospital, her chest pain was labeled as "atypical unstable angina" under "impressions" and, instead, seemed musculoskeletal in nature. According to CITGO's MSDS, a target organ of slop oil is the heart.

Ms. Amos also testified that she was unable to undergo a pending knee surgery as a result of her ongoing heart problems.  Even if **some** of her concerns had been alleviated and attributed to a family history, the testimony about her

27

concerns of ongoing heart ailments was sufficient to warrant an award for fear of future illness. Therefore, we find no error in the trial court believing Ms. Amos had a fear of future illness as she was concerned about her heart following the exposure until she learned that Dr. Springer only related her chest pain until that July of 2006 visit to her exposure. This assignment of error lacks merit.

## Assignment of Error Number Three:

In its third assignment of error, CITGO argues that Ms. Harris, Mr. Richard, Logan Richard, Mr. Haley, and Ms. Amos provided no evidence to support damage awards for loss of enjoyment of life.[5] CITGO argues that these Plaintiffs did not testify or offer evidence regarding how their quality of life diminished because of their alleged exposure injuries.

As stated by this court in *Cormier v. Citgo Petroleum Corp.*, 17-104, p. 4 (La.App. 3 Cir. 10/4/17) 228 So.3d 770, 776 (quoting *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So.2d 456, 458) general damages are reviewed for an abuse of discretion because the trial court is "in the best position to evaluate witness credibility and see the evidence firsthand." "The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact." *Id*. The trier of fact has great, even vast discretion in awarding general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993). "[W]hether or not loss of enjoyment of life is recoverable depends on the particular facts of the case, and should be left to the district court's discretion on a case-by-case analysis." *McGee*, 933 So.2d at 779. The focus is on the total award rather

---

[5]CITGO does not appeal Ms. Stevens' loss of enjoyment of life award, other than through its argument in Assignment of Error Number One, that causation was not proven.

than on awards for each element of damages. The trial court heard the testimony of all Plaintiffs and after a careful review of the particular facts and circumstances of each Plaintiff's damages, made an award for loss of enjoyment of life.

Plaintiffs in the current case testified regarding the length of their symptoms. Ms. Harris testified that she:

> was one of those people that went to work early because I enjoyed my job. I even got a medal that the Corps of Engineers gave me because I was almost the first one to be there, sometimes the last to leave. And I missed a day from work because I was sick. I know that I would not have stayed at home that day if I had not been sick.

Additionally, Ms. Harris testified that the skin rash and blisters she endured made it difficult to do simple tasks such as driving or touching things:

> A. . . . I couldn't even hold the steering wheel . . . .
>
> . . . .
>
> A. This was when I started getting the blisters and the - - the itching and what I have on my hands now. When I started getting that to where I couldn't stand to even touch things I was itching so bad . . . .
>
> When I was here in Lake Charles, it was just scratch, scratch, itch, itch. This is where you can't even stand to put your fingers together. . . .

Ms. Harris further explained the impact her rash had on her:

> Q. Thank you. Are you still treating with your dermatologist for the rash on your hands?
>
> A. No. After a while, you get to the point where I'm tired of going to the doctor for them to tell me "I don't know what's causing this." So you use remedies. You get coconut oil and you put it on your hands so that it won't look bad far away, but it does close up. You don't worry about the nosebleeds. You don't worry about the underarm hair not growing and growing on your legs and whatever. You just deal with it. It's been 11 years.

29

The trial court went over Ms. Harris' symptoms and summarized how she became tired of going to the doctor all the time. The totality of the record supports the trial court's finding that Ms. Harris' injuries caused an interruption or alteration to her daily life. We find no abuse of discretion in this award.

As to the Richards, Mr. Haley, and Ms. Amos, the trial court reiterated their symptoms and the duration of their symptoms before awarding loss of enjoyment of life damages in the amounts of $3,000.00 to Mr. Richard, $1,000.00 to Logan Richard, $2,000.00 to Mr. Haley, and $6,000.00 to Ms. Amos. As Appellees admit, the loss of enjoyment of life experienced by the Richards, Mr. Haley, and Ms. Amos was not as significant as that of the other Plaintiffs, however, the trial court obviously took that into account when awarding a smaller damage award to them.

The Richards' complaints of headaches, itchy throats, watery eyes, and burning noses lasted for about three weeks. Mr. Haley's injuries only lasted approximately three days and, while he did not testify as to the effects on any specific activity, it is reasonable to conclude that trouble tasting, vomiting, headaches, and loss of appetite would detrimentally affect one's daily living. Ms. Amos delayed a pending knee surgery because she was unable to undergo the surgery as a result of her ongoing heart problems which she believes were at a minimum exacerbated by this incident.

The trial court listened to the testimony of all parties presented and reviewed the evidence put forth, weighed the totality of the evidence put forth and made a factual finding that the plaintiffs suffered damages for loss of enjoyment of life and fear of future illness. The trial court has broad discretion in determining a general damages award, and we will not disturb that award.

**CONCLUSION:**

For the above-mentioned reasons, we affirm the trial court's finding of causation, affirm the awards for fear of future illness to Leon Arceneaux and Gardenia Amos, and affirm the loss of enjoyment of life award to Linda Harris, Patrick Richard, Logan Richard, Ricky Haley, and Gardenia Amos. Costs of these proceedings are assessed to Appellant, Citgo Petroleum Corporation.

**AFFIRMED.**